THE STATE OF OHIO, APPELLEE, v. DAVIS, APPELLANT.

[Cite as *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2.]

(No. 2005-1656—Submitted September 19, 2007—Decided January 3, 2008.)

O'CONNOR, J.

{¶ 1} During the late evening of July 10 or the early morning of July 11, 2000, an intruder entered 86-year-old Elizabeth Sheeler's Newark, Ohio apartment. The intruder then murdered Sheeler by stabbing her in the neck and chest. The intruder stole money from the apartment and fled the scene.

{¶ 2} The murder went unsolved for almost four years. In 2004, DNA testing identified defendant-appellant, Roland T. Davis, as the murderer of Sheeler. Subsequently, Davis was convicted of the aggravated murder of Sheeler and sentenced to death.

{¶ 3} Davis now appeals, raising an array of challenges to his convictions and sentence. We determine that none of his propositions of law has merit and affirm Davis's convictions. We have also independently weighed the aggravating circumstances against the mitigating factors and have compared Davis's sentence of death to those imposed in similar cases, as R.C. 2929.05(A) requires. As a result, we affirm Davis's sentence of death.

## State's Case

{¶ 4} Sheeler was a widow who lived alone in a basement apartment at the Plaza Garden Apartments. Sheeler frequently used Yellow Cab taxis for transportation to the grocery store, the bank, and other locations in Newark.

{¶ 5} Davis worked intermittently as a driver for Yellow Cab from 1995 until April 20, 2000. Sheeler often asked for Davis as her taxi driver because he helped Sheeler carry her groceries into her apartment. Yellow Cab records show that Davis provided Sheeler with taxi service on many occasions.

{¶ 6} Davis and Sharon Wright lived together off and on from 1994 until July or August 2000. Wright was a driver with Yellow Cab for about a year. During their relationship, Wright said that Davis "carried a few bucks in his pocket, but most of the time he was broke." Davis was unemployed from June 2 to at least July 10, 2000.

{¶ 7} Davis lived with Terri Geer from late October or early November 1999 until mid-May 2000. Geer said that Davis "never had a lot of money" during that time.

{¶ 8} On the evening of July 10, 2000, Sheeler was at her apartment. Between 8:00 p.m. and 10:00 p.m., Sheeler and her close friend, Elladean Hicks, talked on the telephone. Hicks stated that nothing appeared to be out of the ordinary, and there was no indication that anyone else was at Sheeler's apartment or that she was expecting anyone.

{¶ 9} Melissa Frost was Sheeler's next-door neighbor. At approximately 12:30 a.m. on July 11, 2000, Frost noticed that a light was still on in Sheeler's apartment. Frost also heard loud noise coming from the television in Sheeler's apartment, which stopped sometime after 12:30 a.m.

{¶ 10} Frost did not see Sheeler for the next two days. Frost noticed that Sheeler's front door was not ajar, an unusual circumstance because Sheeler had the habit of keeping the door slightly open during the day. On July 12, Frost noticed two newspapers outside Sheeler's front door. Frost's husband then knocked on Sheeler's front door and called her name. He turned the doorknob and noticed it was unlocked. The Frosts then contacted the apartment manager.

{¶ 11} Kenneth Patterson, the co-owner of Plaza Garden Apartments, entered Sheeler's apartment to check on her well-being. The living room, dining room, and kitchen looked normal. Patterson looked inside Sheeler's bedroom and saw blood on the bed and a foot sticking out from underneath bedding on the floor. The police were then called.

{¶ 12} Around 1:30 p.m. on July 12, 2000, Newark police officers arrived at Sheeler's apartment. Officers found Sheeler's body on the floor next to her bed. Her body was covered by a mattress pad, mattress cover, fitted sheet, and comforter. Sheeler's face had been battered, and her neck and chest area had numerous sharp-instrument wounds. Her dentures were found underneath the bed. Sheeler's housecoat was open and bunched up under the middle of her back. Her panties were torn and cut in the crotch area and rolled up underneath her breasts.

{¶ 13} Detective Timothy Elliget, a Newark police criminalist, found blood spatter that formed a misting pattern above the dresser on the bedroom wall. This blood spatter showed that Sheeler was standing when she was hit in the mouth or throat area. Bloodstain patterns on the bedding indicated that Sheeler had been face down on the bed for a period of time. Elliget also found a bloodstain pattern on the fitted sheet, which was consistent with a blood-covered hand "grabbing the item and pulling [it] off." Another bloodstain formed a butterfly pattern on the mattress pad, which was consistent with the wiping of an object such as a knife.

{¶ 14} Sheeler's bedroom had been ransacked. Dresser drawers were on top of the mattress, a cedar chest had been opened, and items were scattered around the room. The spare bedroom had also been ransacked, with drawers opened and property strewn about.

{¶ 15} Several purses were found in both bedrooms but none of them contained a wallet, identification, pictures, or keys. Police did find $500 in an envelope on the floor of the spare bedroom, two metal boxes containing $2,300 in the closet of the spare bedroom, and $210 in silver certificates elsewhere in the same closet.

{¶ 16} Police found no evidence of forced entry. No knife or other possible murder weapon was found in the apartment. Investigators found 14 usable fingerprints and three usable palm prints. The fingerprints were later entered into the automated fingerprint identification system ("AFIS"), but no matches resulted.

{¶ 17} Police found a bloodstain on a small kitchen towel next to the kitchen sink. It "tested presumptive for blood" and was forwarded for DNA analysis.

{¶ 18} On July 13, 2000, Dr. Patrick Fardal, then the chief forensic pathologist for Franklin County, conducted the autopsy on Sheeler. Sheeler suffered blunt-force injuries to her face and 11 sharp wounds to her chin, neck, and upper chest area. Dr. Fardal found that a stab wound in Sheeler's chest and a stab wound in her neck that injured the left jugular vein were fatal wounds. Sheeler probably would have lived no more than "10 to 20 minutes after sustaining these wounds."

{¶ 19} In 2000, Ramen Tejwani, a criminalist with the Columbus police crime lab, tested evidence from Sheeler's apartment. DNA analysis of the bloodstain on the kitchen towel did not match the DNA from Sheeler or other persons tested at that time. Additionally, presumptive testing of an oral swab taken from Sheeler showed the presence of semen. However, no useful DNA was extracted from the swab.

{¶ 20} In 2001, Tejwani retested the DNA on the towel's bloodstain using the short tandem repeat ("STR") method. This analysis showed that the DNA was from a male contributor.

{¶ 21} Nevertheless, the investigation moved into a cold-case status because there were few leads. On March 1, 2004, Davis became a suspect in the murder after Newark police obtained information from an out-of-state law enforcement agency.

{¶ 22} After investigation of Davis began, police learned that he had purchased a Mercury Grand Marquis on July 10, 2000. He had paid $300 in cash for the car and had agreed to make regular payments.

{¶ 23} Geer stated that after she had not seen Davis for a week or more, Davis showed up at her house on July 11, 2000, driving the Grand Marquis. On the

same day, Davis bought Geer's son a drum set with $1,253.98 in cash. Davis also offered to purchase Geer "anything [she] wanted that night."

{¶ 24} Wright had no contact with Davis on July 10 or July 11, 2000. However, on July 12, 2000, Davis drove the Grand Marquis to Wright's home. Davis said that he had obtained the money to pay for the car by "running drugs from Florida to Ohio." On July 13, Davis took Wright's daughter to a Columbus mall and bought her a $100 pair of tennis shoes and a car stereo, and he took her to dinner. On July 16 or 17, Davis and Wright drove to Florida and returned to Ohio about a week later.

{¶ 25} After Davis became a suspect, police obtained a DNA sample from him and sent it to the Columbus police crime lab. Analysis showed that Davis's DNA matched the DNA from the bloodstain on the kitchen towel. According to Tejwani, the approximate frequency of this DNA type in the population is one in 547,000,000 for Caucasians, one in 332,400,000,000 for African–Americans, one in 1,939,000,000 for southeastern Hispanics, and one in 2,816,000,000 for southwestern Hispanics. Davis is Caucasian.

{¶ 26} Following receipt of the DNA results, Newark detectives Stephen Vanoy and Melanie Mummey interviewed Davis in Florida, where he was living. After Davis waived his *Miranda* rights, he was shown a photograph of Sheeler. He said that she looked familiar, but he did not remember her name. Davis denied seeing Sheeler's photograph on reward posters following her death. He said, "I didn't know she got killed, [until] you just told me." Davis also did not remember ever going into Sheeler's apartment.

{¶ 27} Vanoy told Davis that his DNA was found in Sheeler's apartment. When asked for an explanation, Davis said there was no reason his semen or blood could be in her apartment. However, Davis said that he might have pricked his finger or left a hair in Sheeler's apartment when carrying her groceries.

{¶ 28} As the interview progressed, Davis said, "I'm putting a face with a person * * *." Davis had just said that he had provided taxi service to Sheeler and "liked her a whole lot." Davis also said that Sheeler had shown him around her apartment. As a result, he might have touched a doorknob. However, he denied entering the kitchen and touching any of her towels "or anything like that."

{¶ 29} Davis told police that he obtained the money to buy the drum set and the Grand Marquis by taking "a load of Cocaine [to] * * * Elkhart, Indiana." Davis said he delivered $40,000 worth of cocaine and made $10,000. However, he refused to divulge the name of his supplier.

{¶ 30} Before the interview ended, Davis described his trips to Sheeler's apartment when he provided her taxi service. Davis said he would knock on her door, wait inside her apartment as she was getting ready, lock the door when they left, and escort her to his taxi by holding her arm. However, Davis said that he had not been in Sheeler's apartment since he quit driving a cab. Davis denied killing Sheeler and said, "I didn't do it at all!!"

{¶ 31} Later, Vanoy reinterviewed Davis. After waiving his *Miranda* rights, Davis continued to deny any involvement in Sheeler's murder. However, Davis admitted lying about knowing Sheeler, saying, "[Y]ou guys were trying to pin a murder on me."

{¶ 32} In late 2004, Susan Fowls, a former employee of Annie's Place restaurant in Newark, saw a photograph of Davis in a newspaper article about his arrest. Fowls remembered that during the late spring or early summer of 2003, Davis had entered the restaurant and had asked about Sheeler's murder after noticing a reward poster that displayed Sheeler's photograph inside the restaurant. According to Fowls, Davis repeatedly asked her, "Did they have any leads[?] Do they know who did it[?] Do the police have any suspects[?]"

{¶ 33} Terianne Paxson, the restaurant's owner, also talked to Davis about Sheeler's murder. Davis thought that Sheeler used to be his neighbor, and he could not believe that someone would murder her. He asked Paxson if she knew whether Sheeler had been sexually assaulted. After Davis left the restaurant, Paxson wrote down his license number, but she did not notify police until after his photograph appeared in the newspaper.

{¶ 34} During September 2004, DNA analysis using Y-chromosome testing was conducted on the bloodstained fitted sheet from Sheeler's bedroom. According to Meghan Clement, the technical director for forensic identity testing at Laboratory Corporation of America Holdings, Inc. ("LabCorp"), three bloodstains matched Davis's DNA profile.

{¶ 35} Further DNA analysis using autosomal STR testing was conducted on two of the bloodstains from the fitted sheet. Clement testified, "The profiles that were obtained from both samples were consistent with a mixture. * * * In looking at the profiles, we could not exclude Mr. Davis as a contributor to either of those particular mixtures. And for specifically [one location], * * * the male was the major contributor * * * and those [major characteristics in the DNA mixture] indeed matched Mr. Davis." The statistical frequency of that DNA's presence is one in 97.1 quadrillion in the Caucasian population, one in 2.62 sextillion in the African–American population, and one in 1.23 quintillion in the Hispanic population.

{¶ 36} During October 2004, Richard Hummel and Davis were in the orientation module at the Licking County jail. Hummel testified that one day, he told

Davis, "[C]heer up, they can't eat you, man." Davis responded, "Oh no, I did it." Davis then explained that he got to know the victim when he was driving a cab and helped her carry groceries and performed other jobs for her. Davis said he "stabbed her five, seven times or so."

## Defense Case

{¶ 37} The defense presented the stipulated testimony of Dr. C. Jeff Lee, the Deputy Coroner for Licking County. Dr. Lee performed the autopsy on Randy L. Davis, the defendant's brother, who had died in an automobile accident on November 26, 2002. Dr. Lee stated that a sample of Randy's blood had been collected and preserved and was available at the coroner's office.

{¶ 38} The defense presented no other trial-phase evidence.

## Case History

{¶ 39} The grand jury indicted Davis on one count of aggravated murder. Count 1 charged Davis with the aggravated murder of Sheeler while committing kidnapping, aggravated robbery, or aggravated burglary. Count 1 contained four death-penalty specifications: murder for the purpose of escaping detection, apprehension, trial, or punishment, R.C. 2929.04(A)(3); murder while committing, attempting to commit, or fleeing after committing kidnapping, R.C. 2929.04(A)(7); murder while committing, attempting to commit, or fleeing after committing aggravated robbery, R.C. 2929.04(A)(7); and murder while committing, attempting to commit, or fleeing after committing aggravated burglary, R.C. 2929.04(A)(7).

{¶ 40} Davis was charged with four additional counts: Count 2 charged Davis with murder, Count 3 charged kidnapping, Count 4 charged aggravated robbery, and Count 5 charged aggravated burglary.

{¶ 41} Davis pleaded not guilty to all charges. The jury found him guilty of all charges, and he was sentenced to death.

## Pretrial and Trial Issues

{¶ 42} *Jury selection.* In proposition of law I, Davis asserts that he was denied a fair and impartial jury.

{¶ 43} **1. Denial of careful and searching voir dire.** First, Davis argues that he was denied a careful and searching voir dire about pretrial publicity. Davis also claims that his counsel were ineffective by failing to fully question jurors about pretrial publicity.

{¶ 44} "The manner in which voir dire is to be conducted lies within the sound discretion of the trial judge." *State v. Lorraine* (1993), 66 Ohio St.3d 414, 418,

613 N.E.2d 212. A trial court has "'great latitude in deciding what questions should be asked on voir dire.'" *State v. Wilson* (1996), 74 Ohio St.3d 381, 386, 659 N.E.2d 292, quoting *Mu'Min v. Virginia* (1991), 500 U.S. 415, 424, 111 S.Ct. 1899, 114 L.Ed.2d 493. Absent a clear abuse of discretion, prejudicial error cannot be assigned to the examination of the venire. *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 28.

{¶ 45} The record shows that the voir dire on pretrial publicity was comprehensive. The trial court asked the prospective jurors whether any of them knew about the case through firsthand information or media coverage. The trial court then asked prospective jurors who had indicated some familiarity with the case whether they could lay aside what they had heard and decide the case solely upon the evidence presented at trial. Counsel were then given the opportunity to fully question the prospective jurors about their exposure to pretrial publicity. Following thorough questioning, the trial court excused members of the venire who had formed fixed opinions due to pretrial publicity or were otherwise unsuitable.

{¶ 46} Davis's ineffectiveness claim also lacks merit. Reversal of a conviction for ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 47} Trial counsel questioned the prospective jurors about pretrial publicity after the trial court and the prosecutor had finished examining them about the same matter. Trial counsel's questioning about pretrial publicity was brief. However, trial counsel were not deficient, because counsel "need not repeat questions about topics already covered by group voir dire, opposing counsel, or the judge." *State v. Watson* (1991), 61 Ohio St.3d 1, 13, 572 N.E.2d 97.

{¶ 48} Second, Davis contends that he was entitled to a change of venue because of pervasive pretrial publicity. However, trial counsel waived this issue by failing to request a change of venue. *State v. Campbell* (2000), 90 Ohio St.3d 320, 336, 738 N.E.2d 1178.

{¶ 49} Davis also claims that his counsel were ineffective by failing to request a change of venue. Trial counsel's failure to request a change of venue is not tantamount to ineffective assistance of counsel. As previously discussed, the voir dire about pretrial publicity was adequate. Thus, counsel could have reasonably decided not to request a change of venue. See *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 156. Moreover, a change of venue is not automatically granted when there is pretrial publicity. Any decision to change venue rests largely within the discretion of the trial judge. See *State v. White* (1998), 82 Ohio St.3d 16, 25, 693 N.E.2d 772. Accordingly, this claim lacks merit.

{¶ 50} We also reject Davis's assertion that his counsel were ineffective by failing to develop the record about the level of pretrial publicity in his case. The trial court was well aware of the extent of pretrial publicity because many prospective jurors acknowledged that they had heard something about the case. Thus, Davis has failed to show how trial counsel's failure to submit newspaper clippings and other media stories was prejudicial.

{¶ 51} Third, Davis argues that the trial court and counsel failed to adequately question prospective jurors to develop challenges for cause or exercise peremptory challenges. However, Davis fails to explain the additional information that should have been obtained. Thus, this claim lacks merit.

{¶ 52} Finally, Davis complains that the trial court required counsel to conduct voir dire after regular court hours. Before concluding voir dire, the trial court informed counsel, "I'm inclined to finish this group. * * * We have two more sets of six. Generally get those done tonight and come back in the morning and start." The court completed voir dire and recessed at 6:30 p.m.

{¶ 53} Davis argues that the voir dire examination conducted late in the day became increasingly incoherent because counsel were tired. The prosecutor remarked, "I'm getting punchy. * * * It's 25 'til six." Davis also points out that his trial counsel's voir dire of the last group of jurors comprised only three and one-half pages of the transcript.

{¶ 54} "The scope of voir dire is within the trial court's discretion and varies depending on the circumstances of each case." *State v. Bedford* (1988), 39 Ohio St.3d 122, 129, 529 N.E.2d 913. The trial court's action ensured the orderly flow of the case and did not constitute an abuse of discretion. Moreover, Davis suffered no prejudice, because none of the prospective jurors questioned after hours actually served on the jury.

{¶ 55} **2. Standard for excusing jurors.** Davis argues that the trial court erred in applying the standard set forth in *Wainwright v. Witt* (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841, instead of the standard in R.C. 2945.25(C), in excusing prospective jurors who expressed reservations about capital punishment. However, *Witt* enunciates the correct standard for determining when a prospective juror may be excluded for cause based on his or her opposition to the death penalty. See *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus. Moreover, Davis's claim that his counsel were ineffective by failing to object lacks merit, because the *Witt* standard was properly applied.

{¶ 56} **3. Examination of death-penalty-opposed jurors.** Davis contends that trial counsel failed to fully question and rehabilitate prospective jurors who said they opposed the death penalty and that counsel failed to object to the state's challenge of these jurors.

{¶ 57} Davis cites five veniremen whom counsel should have rehabilitated: Spearman, Smith, Barsky, Hanson, and Harden. During voir dire, all of these jurors stated they were opposed to the death penalty and could not sign a death verdict. Trial counsel did not object to the challenge of Spearman but did object to the challenge of the other four jurors. The trial court excused all five jurors.

{¶ 58} Trial counsel attempted to rehabilitate each of the jurors before they were excused. We reject Davis's claim that counsel should have asked these jurors more questions, because counsel were in the best position to determine whether the jurors could be rehabilitated. See *State v. Jones* (2000), 90 Ohio St.3d 403, 410–411, 739 N.E.2d 300. Moreover, trial counsel were not ineffective by failing to object to the exclusion of Spearman, because she clearly stated her unwillingness to sign a death verdict.

{¶ 59} **4. Failure to voir dire regarding mitigating evidence.** First, Davis argues that the trial court refused to permit counsel to fully examine prospective jurors about mitigating evidence. Consequently, the selected jurors would be likely to "automatically vote for the death penalty and * * * would not consider mitigating evidence." This claim lacks merit because trial counsel were given extensive leeway to examine prospective jurors regarding their willingness to consider mitigating evidence.

{¶ 60} Second, Davis argues that jurors Marston and Cronin were not fully questioned about whether they could fairly consider mitigating evidence and impose a life sentence. Davis also claims that counsel's inadequate voir dire resulted in the failure to develop a successful challenge for cause against them.

{¶ 61} "The conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked." *State v. Evans* (1992), 63 Ohio St.3d 231, 247, 586 N.E.2d 1042. "[C]ounsel is in the best position to determine whether any potential juror should be questioned and to what extent." *State v. Murphy* (2001), 91 Ohio St.3d 516, 539, 747 N.E.2d 765.

{¶ 62} During voir dire, juror Marston stated his belief that all people convicted of intentionally killing another person should face the death penalty. Trial counsel tested juror Marston's willingness to consider mitigating evidence by asking him whether the same crime committed by two separate people with different backgrounds had mitigating features. Juror Marston replied, "[S]ame crime, same penalty." During further questioning, juror Marston expressed his willingness to follow the law, evaluate mitigating factors, and consider all four sentencing options. Trial counsel challenged juror Marston for cause, but the trial court denied the challenge.

{¶ 63} Trial counsel were not deficient in questioning juror Marston. Counsel asked probing questions about fairly considering mitigating evidence and all lesser sentencing options. Moreover, counsel had no basis to challenge juror

Marston for cause, because Marston expressed his willingness to consider the mitigating evidence and all four sentencing options. See *Morgan v. Illinois* (1992), 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492; *State v. Braden,* 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 37.

{¶ 64} We also reject Davis's claim that counsel failed to fully question juror Cronin and challenge her for cause. During voir dire, juror Cronin expressed the view that identical crimes deserve identical punishment, regardless of the social backgrounds of the perpetrators. However, trial counsel questioned juror Cronin about her willingness to consider various mitigating evidence. Juror Cronin stated that she would consider the mitigating evidence and all potential sentencing options. Thus, counsel had no basis to challenge juror Cronin for cause.

{¶ 65} Finally, Davis claims that the court and trial counsel failed to question the jurors about whether they could consider mitigating evidence and impose a life sentence even though the victim was an elderly woman murdered in her own home.

{¶ 66} Davis invokes *State v. Jackson,* 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 60–62, in making this argument. *Jackson* held that a "trial court abused its discretion by refusing *defense counsel's requests* to advise prospective jurors that one of the murdered victims was a three-year-old child and by refusing to allow voir dire on that fact." (Emphasis added.) Id. at ¶ 62. However, Jackson does not apply to this case, because trial counsel never sought to question the jurors about their views on imposing the death penalty when the victim was an elderly woman. Counsel's decision to forgo this line of questioning constituted a legitimate tactical decision. See *State v. Keith* (1997), 79 Ohio St.3d 514, 521, 684 N.E.2d 47. Indeed, counsel could have decided not to question the jurors about the victim's elderly status to avoid focusing the jury's attention on this issue at the very beginning of its case.

{¶ 67} We also hold that the trial court was not required to sua sponte question the jurors about the victim's elderly status because counsel failed to do so. See *Turner v. Murray* (1986), 476 U.S. 28, 37, 106 S.Ct. 1683, 90 L.Ed.2d 27, fn. 10.

{¶ 68} **5. Misleading statements.** Davis contends that the prosecutor committed misconduct by making misleading statements during voir dire. However, the defense failed to object to these statements and waived all but plain error. *State v. Lundgren* (1995), 73 Ohio St.3d 474, 484, 653 N.E.2d 304. In the alternative, Davis argues that his counsel were ineffective by failing to object to these remarks.

{¶ 69} First, Davis argues that the prosecutor improperly told the jurors that they could determine what evidence was mitigating. The prosecutor informed the prospective jurors that it was their duty to determine the assessment and weight to be given mitigating evidence. The prosecutor's statements correctly

summarized the law on mitigation. See *State v. Jones* (2001), 91 Ohio St.3d 335, 352, 744 N.E.2d 1163. Thus, no plain error was committed, and counsel were not ineffective by failing to object.

{¶ 70} Second, Davis claims that the prosecutor's voir dire was misleading because he asked questions about mitigating factors that did not apply to this case. During small-group voir dire, the prosecutor posed a hypothetical question about two men committing a murder at a convenience store. The hypothetical contrasted a young defendant from a disadvantaged background with an older defendant from a good family and with many opportunities. The hypothetical tested the willingness of the prospective jurors to consider mitigating evidence. The prosecutor's questions were not misleading because the jurors knew they were being asked hypothetical questions. See *State v. Jackson*, 107 Ohio St.3d 300, 2006-Ohio-1, 839 N.E.2d 362, ¶ 132.

{¶ 71} Davis also argues that the prosecutor's use of the hypothetical was prejudicial because the prosecutor later used the hypothetical during final argument. During penalty-phase arguments, the prosecutor mentioned the hypothetical situation as a means of explaining that the jury should give little weight to Davis's background. However, this argument was not improper. *State v. Wilson*, 74 Ohio St.3d at 399, 659 N.E.2d 292.

{¶ 72} Third, Davis claims that the prosecutor misled the prospective jurors by informing them that any sentencing verdict would have to be unanimous. The prosecutor's comments accurately stated the law. See *State v. Nields* (2001), 93 Ohio St.3d 6, 30, 752 N.E.2d 859. Thus, no plain error was committed, and trial counsel were not deficient by failing to object.

{¶ 73} **6. Failure to excuse jurors.** Davis also complains that he was denied a fair and impartial jury because many of the jurors knew too much about the crime, the victim, or Davis and his family.

{¶ 74} Davis fails to mention any specific juror who should have been excused. However, prospective jurors who indicated some familiarity with the crime, the victim, or the witnesses were identified. Following thorough questioning, the trial court excused members of the venire who had formed a fixed opinion about the case or indicated an association with the victim or the witnesses that made them unsuitable to serve on the jury. This claim lacks merit.

{¶ 75} **7. Commitment to sign death verdict.** Davis argues that the prosecutor and trial court improperly sought commitments from the prospective jurors to sign a death verdict. However, the defense failed to object to such questions and waived all but plain error. *State v. Lundgren*, 73 Ohio St.3d at 484, 653 N.E.2d 304. Alternatively, Davis argues that his counsel were ineffective by failing to object to such remarks.

{¶ 76} During voir dire, the prosecutor asked some prospective jurors whether they would be able to sign a death verdict if the accused were to be convicted as charged and if the aggravating circumstances were found to outweigh the mitigating factors. Such questioning was proper because the relevant inquiry during voir dire in a capital case is whether the juror's beliefs would prevent or substantially impair his or her performance of duties as a juror in accordance with the instructions and the oath. *Wainwright v. Witt*, 469 U.S. at 424, 105 S.Ct. 844, 83 L.Ed.2d 841. "Clearly, a juror who is incapable of signing a death verdict demonstrates substantial impairment in his ability to fulfill his duties." *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 34.

{¶ 77} Davis also claims error because the prospective jurors were not asked whether they would be able to sign a life verdict. "There is no requirement for a trial court to 'life qualify' any prospective juror, absent a request by defense counsel, in a capital murder case." *State v. Stojetz* (1999), 84 Ohio St.3d 452, 705 N.E.2d 329, syllabus. No plain error occurred, because the defense made no such request. Moreover, Davis's ineffectiveness claim lacks merit because he has failed to show that his counsel were ineffective by failing to object to the state's questions or by failing to request that the jurors be life qualified.

{¶ 78} **8. Failure to question juror about an outside influence.** Davis argues that he was denied a fair trial because the trial court and counsel failed to question juror Wallace after learning that she had been fired from her job for serving on the jury.

{¶ 79} Following voir dire, juror Wallace told the bailiff that she had received some pressure from her employer to get off the jury. The trial court informed counsel that Wallace, a cook at Applebee's, was told to wear white-supremacist clothing or lie about certain answers to avoid jury duty. Wallace told her employer that she was not going to lie or do anything wrong. She also called the corporate office to report her boss. The prosecutor asked whether the pressure would affect Wallace's behavior on the jury. The trial court said, "No. In fact, she indicated just the opposite. She felt that she couldn't do those things. She told us she's not a liar, she's not going to take any steps like that. * * * [Y]ou saw her yesterday, all the jurors * * * [take] their obligation seriously and I felt were honest * * *." Both counsel stated that further voir dire of Wallace was unnecessary.

{¶ 80} On the next day, the trial court informed counsel that juror Wallace reported that she had been fired after telling her boss that she had been selected as a juror. Juror Wallace said she had "talked to the boss' boss who told her all the right things; you're on the payroll; * * * you're going to get paid; do your duty, and after you're done, come talk to me and we'll take care of it then." Trial counsel said, "I was kind of led to believe that she's okay with all of this." The

trial court said, "That's the impression I certainly received, too. In fact, I think the owner's position has been just what you would hope it would be, and he seems to be supportive of her * * *. [T]hey seem to have that under control and she seems to be in a fine state of mind, too." Both counsel declined to conduct any further voir dire of juror Wallace.

{¶ 81} In cases involving outside influences on jurors, trial courts are granted broad discretion in dealing with the contact and determining whether to declare a mistrial or to replace an affected juror. *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 191. A trial court is permitted to rely on a juror's testimony in determining that juror's impartiality. *State v. Herring* (2002), 94 Ohio St.3d 246, 259, 762 N.E.2d 940. Juror Wallace assured the court that her job situation would not affect her ability to serve as a juror. Counsel were obviously convinced that juror Wallace could remain a fair and impartial juror. Thus, the trial court and counsel could allow juror Wallace to remain on the jury without conducting further inquiry.

{¶ 82} Based on the foregoing, we overrule proposition I.

{¶ 83} *Tape recordings and transcript.* In proposition of law II, Davis argues that the admission of his tape-recorded statements without identification or authentication violated his right to a fair trial. Davis further argues that his counsel were ineffective by failing to object to the lack of authentication or identification of the tape recordings.

{¶ 84} The tape recordings of Detective Vanoy's first interview of Davis were not played during the trial. Without defense objection, the tape recordings of the interview and a transcript of the tape were admitted into evidence. The tape recordings and the transcript were supplied to the jury during deliberations at both phases of the trial. The trial court instructed the jury during both phases:

{¶ 85} "[Y]ou will receive as an exhibit two tape recordings identified as being a portion of the statement the Defendant gave to Newark police officers. The portion on these tapes are those sections of the Defendant's statement that the parties have *jointly agreed to admit* into evidence." (Emphasis added.)

{¶ 86} Davis's failure to object to the tape recordings waived all but plain error. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 187 (failure to object to 911 tape waived claims of lack of authenticity). He also agreed to admit the tapes without objecting to their authenticity. Thus, Davis invited any error and may not "take advantage of an error which he himself invited or induced." *Hal Artz Lincoln–Mercury, Inc. v. Ford Motor Co.* (1986), 28 Ohio St.3d 20, 28 OBR 83, 502 N.E.2d 590, paragraph one of the syllabus.

{¶ 87} We reject Davis's claim on the basis of plain error and invited error. The parties' agreement to admit the tape recordings into evidence eliminated the

need to authenticate the tapes before they were introduced into evidence, as Evid.R. 901(B)(5) requires. See also *State v. McGuire* (1997), 80 Ohio St.3d 390, 396, 686 N.E.2d 1112 ("Sending properly admitted evidence into jury deliberations rests within the sound discretion of the trial judge").

{¶ 88} We also reject Davis's ineffectiveness claim. In his statement, Davis adamantly denied any responsibility for Sheeler's death. By introducing the tapes, counsel had the benefit of presenting Davis's proclamations of innocence to the jury, without the risk of having Davis take the stand. See *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 34. Thus, trial counsel made a tactical decision by agreeing to introduce Davis's tape-recorded statement. We overrule proposition II.

{¶ 89} In proposition of law III, Davis argues that the failure to play the tape recordings in open court violated his right to be present at all stages of his criminal trial and violated his right to a public trial. He also claims that the admission of the transcript of the tape recording violated the "best evidence" rule. In the alternative, Davis argues that his counsel were ineffective by failing to object.

{¶ 90} **1. Right to be present.** An accused has a fundamental right to be present at all stages of his criminal trial. Section 10, Article I, Ohio Constitution; Crim.R. 43(A). An accused's absence, however, does not necessarily result in prejudicial or constitutional error. "[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Snyder v. Massachusetts* (1934), 291 U.S. 97, 107–108, 54 S.Ct. 330, 78 L.Ed. 674, overruled on other grounds, *Duncan v. Louisiana* (1968), 391 U.S. 145, 154, 88 S.Ct. 1444, 20 L.Ed.2d 491, and *Malloy v. Hogan* (1964), 378 U.S. 1, 2, 84 S.Ct. 1489, 12 L.Ed.2d 653, fn. 1. See *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 50.

{¶ 91} Davis waived this claim by failing to object to the admission of the tapes without playing them in open court. See *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 122. Moreover, Davis's right to be present was not violated. He was present in court when the tape recording and transcript were offered and admitted into evidence. He could review the verbatim transcript of the tapes when the tapes were admitted.

{¶ 92} Davis claims that waiver does not apply because he did not personally waive his right to be present on the record, and the trial court did not find that such waiver was knowingly and intelligently made. However, we hold that the trial court was not required to conduct a colloquy on the record to establish a knowing waiver of Davis's right to be present. *United States v. Riddle* (C.A.6, 2001), 249 F.3d 529, 534. We reject this claim.

{¶ 93} **2. Right to a public trial.** Davis claims that his right to a public trial was violated because the tape recording of his interview was not played in open court. However, the trial court never closed the courtroom during the trial. Vanoy testified about his interview of Davis, and the tape recording and transcript of that interview were introduced in open court. Moreover, Davis's failure to object constitutes a waiver of his right to have the tapes played in open court. See *Levine v. United States* (1960), 362 U.S. 610, 619, 80 S.Ct. 1038, 4 L.Ed.2d 989; *State v. Drummond,* 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 59. We also reject this claim.

{¶ 94} **3. Use of the transcript.** Davis argues that the admission of the transcript violated the "best evidence" rule, Evid.R. 1002. He claims that the best evidence of the content of the tape was the tape itself.

{¶ 95} Davis's failure to object to the admission of the transcript waived all but plain error. See *State v. Kehoe* (1999), 133 Ohio App.3d 591, 605, 729 N.E.2d 431. Moreover, Davis agreed to admit the transcript, without objecting that it was not the best evidence. Davis may not take advantage of "invited error" by now claiming that the transcript violated Evid.R. 1002. *Hal Artz Lincoln–Mercury, Inc.,* 28 Ohio St.3d 20, 28 OBR 83, 502 N.E.2d 590, paragraph one of the syllabus.

{¶ 96} We reject this claim on the basis of plain error and invited error. This claim also lacks merit. The transcript was provided to the jury as a listening aid. See *State v. Mason* (1998), 82 Ohio St.3d 144, 159, 694 N.E.2d 932. Davis's claim that the jury may have relied solely on the transcript during deliberations is purely speculative. The trial court carefully instructed the jury during both phases:

{¶ 97} "In addition to these tapes, you will receive a transcript of these tapes. However, the transcript is not evidence, only the tapes are. The transcript is intended only as an aid. In the event you feel there is any discrepancy between what is actually said on the tape and what the transcript says, you must rely upon the tapes themselves."

{¶ 98} Further, the defense never challenged the accuracy of the transcript at trial. "Where there are no 'material differences' between a tape admitted into evidence and a transcript given to the jury as a listening aid, there is no prejudicial error." *State v. Waddy* (1992), 63 Ohio St.3d 424, 445, 588 N.E.2d 819.

{¶ 99} We also reject Davis's ineffectiveness claim because of counsel's tactical decision to permit the introduction of the tapes and the transcript. Based on the foregoing, we overrule proposition III.

{¶ 100} *Gruesome photographs.* In proposition of law IV, Davis argues that the trial court erred in admitting gruesome autopsy and crime-scene photographs during both phases of the trial.

{¶ 101} In capital cases, nonrepetitive photographs, even if gruesome, are admissible as long as the probative value of each photograph outweighs the danger of material prejudice to the accused. *State v. Morales* (1987), 32 Ohio St.3d 252, 257, 513 N.E.2d 267; *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus. Decisions on the admissibility of photographs are "left to the sound discretion of the trial court." *State v. Slagle* (1992), 65 Ohio St.3d 597, 601, 605 N.E.2d 916.

{¶ 102} **1. Crime-scene photographs.** Davis complains about five gruesome crime-scene photographs that the defense objected to at trial. Davis claims that the photographs were cumulative and introduced to inflame the jury.

{¶ 103} State's exhibit 4–X shows Sheeler's body as she was found on the bedroom floor after the sheets and bedspread were removed from her body. State's exhibit 4–X was relevant in showing the position of Sheeler's body at the crime scene. See *State v. Gapen,* 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 85.

{¶ 104} State's exhibit 4–V shows that Sheeler's panties had been removed. This photo supported the state's theory that Davis kidnapped Sheeler for the purpose of engaging in sexual activity.

{¶ 105} State's exhibit 4–Y is a photograph of Sheeler's upper chest area showing numerous sharp instrument wounds on her neck and chest area. This photograph also shows a blood trail leading from the victim's head and running down her chest. State's exhibit 4–Y supported Detective Elliget's testimony that the blood trail showed that Sheeler was standing when she was attacked and then later ended up on her back.

{¶ 106} State's exhibit 4–N shows bloodstained bedding covering the victim's foot and hand. State's exhibit 4–O is a distant shot taken across the bedroom showing some bloodstained bedding. State's exhibits 4–N and 4–O are not gruesome photographs but show that Sheeler's bedroom had been ransacked after she was killed.

{¶ 107} We hold that the trial court did not abuse its discretion in admitting these few selected photographs. State's exhibits 4–V, 4–X, and 4–Y, although gruesome, were probative of Davis's intent and the manner and circumstances of Sheeler's death. See *State v. Craig,* 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 92.

{¶ 108} **2. Autopsy photographs.** Davis argues that the trial court erred in admitting 12 autopsy photographs that the defense objected to at trial. State's

exhibit 7–B depicts Sheeler's body prior to the autopsy and shows extensive wounds to her head and face. State's exhibits 7–E and 7–F are photographs showing that Sheeler received blunt-force injuries to her face and a sharp-injury wound to the left side of her neck. These photographs illustrated Dr. Fardal's testimony and provided an overall perspective of the victim's wounds.

{¶ 109} State's exhibit 7–C depicts marbling and skin slippage on Sheeler's face. This photograph supported Dr. Fardal's conclusion that Sheeler was killed two to three days before the autopsy was conducted. State's exhibit 7–D shows Sheeler's bruised lips, bruised and lacerated tongue, and toothlessness. This photograph supported Dr. Fardal's testimony that Sheeler could have lost her dentures as a result of her attack.

{¶ 110} State's exhibits 7–G and 7–J focus on different sharp-injury wounds on Sheeler's neck. Dr. Fardal testified that these wounds are consistent with a knife being held underneath Sheeler's chin. State's exhibits 7–H and 7–I depict different sharp-injury wounds to Sheeler's upper trunk. Each photograph has a ruler showing the length of the separate injuries. These exhibits supported Dr. Fardal's conclusion that a single-edged knife caused these wounds.

{¶ 111} State's exhibit 7–L shows a hemorrhage in the temporalis muscle and an injury in the frontal scalp area caused by two points of impact. State's exhibit 7–M shows a hemorrhage to the back part of her head caused by a separate impact. Using these photographs, Dr. Fardal testified that Sheeler did not suffer a fatal brain injury but may have received a concussion resulting in a loss of consciousness.

{¶ 112} Finally, state's exhibit 7–K depicts the victim's trachea and esophagus and shows that blood was aspirated into her trachea. This photograph supported Elliget's testimony that blood spatter on the bedroom wall shows that Sheeler was standing when hit in the head.

{¶ 113} We hold that the trial court did not abuse its discretion in admitting the autopsy photographs. The autopsy photographs were limited in number, noncumulative, and had substantial probative value. Each of these photographs supported Dr. Fardal's testimony and demonstrated Davis's intent to murder Sheeler. See *Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 90.

{¶ 114} **3. Gruesome photographs during the penalty phase.** During the penalty phase, no autopsy photographs were admitted into evidence. The trial court admitted, over defense objection, state's exhibits 4–V, 4–X, and 4–Y. However, a trial court may properly allow repetition of much or all that occurred in the guilt phase, pursuant to R.C. 2929.03(D)(1). *State v. DePew* (1988), 38 Ohio St.3d 275, 282–283, 528 N.E.2d 542. The trial court did not abuse its discretion by admitting these photographs. The trial court also committed no

plain error in admitting, without objection, two nongruesome photographs, state's exhibits 4–N and 4–O.

{¶ 115} Based on the foregoing, we overrule proposition IV.

{¶ 116} *Detective Vanoy's testimony.* In proposition of law V, Davis claims that Newark police detective Vanoy improperly testified about the investigation and his interviews of Davis. However, except where noted, Davis failed to object and waived all but plain error. *State v. Childs* (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus. Additionally, Davis argues that his counsel were ineffective by failing to object to Vanoy's testimony.

{¶ 117} First, Davis argues that Vanoy improperly testified that Davis became a suspect in Sheeler's murder after the police received a tip. Vanoy testified that on March 1, 2004, he received information from an out-of-state law enforcement agency that made Davis a suspect in Sheeler's murder. This testimony was offered to explain Vanoy's actions in opening the investigation. It was not hearsay, as it was not offered to prove the truth of the matter asserted. *State v. Thomas* (1980), 61 Ohio St.2d 223, 232, 15 O.O.3d 234, 400 N.E.2d 401. Vanoy's reasons for opening the investigation were relevant and helped provide the foundation for his subsequent testimony. No plain error occurred.

{¶ 118} Second, Davis argues that Vanoy improperly testified about Davis's reaction during the interview when he was shown Sheeler's photograph and Sheeler's name was mentioned. Vanoy described Davis's response after he was shown Sheeler's photograph for the first time: "Yeah, she kind of looks kind of familiar. Not really sure. She may have requested me before. Just was very non-committal, very wishy washy about it." Vanoy also described Davis's reaction when he told Davis that the photograph was Elizabeth Sheeler: "[H]e was kind of playing around with the name a little bit as if he didn't even know who— he wasn't putting the face with the name."

{¶ 119} Evid.R. 701, which governs opinion testimony by lay witnesses, provides: "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

{¶ 120} Vanoy's testimony satisfied both requirements of Evid.R. 701. Vanoy observed Davis's demeanor, and Davis's reaction was relevant in showing his evasiveness. See *State v. Hand,* 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 125 (detective's testimony about defendant's reaction to the news of his wife's murder admissible as lay opinion); *State v. Stojetz,* 84 Ohio St.3d at 463, 705 N.E.2d 329 (testimony that witness appeared "scared" and "not able to think" admissible as lay opinion). Thus, Vanoy's testimony did not result in plain error.

{¶ 121} Third, Davis argues that Vanoy improperly expressed his opinion that Davis had lied during his first and second interview. Vanoy returned to Newark after completing his first interview of Davis. Vanoy stated: "[W]e basically round tabled the investigation with the prosecutor's office, our crime scene personnel. You know, *we had someone who was being very deceptive to us*. We had this person's DNA on her kitchen towel." (Emphasis added.)

{¶ 122} A police officer's opinion that an accused is being untruthful is inadmissible. See *State v. Potter*, Cuyahoga App. No. 81037, 2003-Ohio-1338, 2003 WL 1355230, ¶ 39 (officer's testimony that defendant's version of events was untruthful was improper); *State v. Miller* (Jan. 26, 2001), Montgomery App. No. 18102, 2001 WL 62793, *5; see also *State v. Boston* (1989), 46 Ohio St.3d 108, 129, 545 N.E.2d 1220 (an expert may not express opinion of a child declarant's veracity).

{¶ 123} Vanoy's testimony that Davis "was being very deceptive" to them expressed his opinion that Davis was being untruthful and was erroneously admitted. Nevertheless, Vanoy's isolated comment did not result in plain error. There was overwhelming evidence of Davis's guilt. His DNA was found in bloodstains at the murder scene. This evidence was corroborated by testimony that Davis had had frequent contact with Sheeler as a taxi driver and that he went on a buying spree near the time of her murder.

{¶ 124} Davis also claims that Vanoy improperly expressed his opinion that Davis had lied during his second interview by testifying:

{¶ 125} "Mr. Davis continued to deny being involved in [Sheeler's] murder. However, one thing that stood out that was substantially different from what he had told us in Florida was *he admitted that he had lied* to Detective Mummy about knowing Mrs. Sheeler. And I asked him why had he lied to us about that, and he said, because you guys were trying to pin the murder on me." (Emphasis added.)

{¶ 126} We reject this claim because Vanoy was not expressing his opinion that Davis lied. Rather, Vanoy simply testified that Davis admitted lying to investigators during his first interview.

{¶ 127} Fourth, Davis argues that Vanoy's ongoing commentary and interpretation of Davis's reactions during the interview denied him the right to confrontation in violation of *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177. In *Crawford*, the United States Supreme Court held that the Confrontation Clause bars "testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had a prior opportunity for cross-examination." Id. at 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177. *Crawford* does not apply to Vanoy's testimony about Davis's statements because Davis is the accused.

{¶ 128} Fifth, Davis contends that Vanoy should not have testified about his first interview of Davis because the tape and transcript of the interview were available, and the tape provided the best evidence of his statements. However, the "best evidence" rule did not prohibit Vanoy's testimony about the interview, even though the tape and transcript of the interview were also available. See *State v. Turvey* (1992), 84 Ohio App.3d 724, 735, 618 N.E.2d 214; *State v. James* (1974), 41 Ohio App.2d 248, 249, 70 O.O.2d 456, 325 N.E.2d 267. Thus, no plain error occurred.

{¶ 129} Sixth, Davis claims that Vanoy's testimony that Davis refused to give a tape-recorded statement after the second interview was an improper comment on his Fifth Amendment right to remain silent. Vanoy testified that Davis was interviewed for a second time after police decided to arrest him, but this interview was not tape-recorded. During cross-examination, Vanoy explained why the second interview was not recorded: "It was just a decision not to record that interview. We wanted to go back and get a taped statement from Mr. Davis and we tried, but he was unwilling to give us a taped statement." On redirect, Vanoy repeated, "[W]e tried to do a recorded statement after the fact [but] Mr. Davis would not give us one."

{¶ 130} A prosecutor may not use a defendant's postarrest, post-*Miranda* silence against him at trial. *Wainwright v. Greenfield* (1986), 474 U.S. 284, 295, 106 S.Ct. 634, 88 L.Ed.2d 623. However, Vanoy's testimony that Davis refused to provide a recorded statement was not a comment on Davis's right to remain silent. Davis had already freely and voluntarily discussed the crime with Vanoy on two occasions. Thus, his refusal to give a recorded statement after providing an unrecorded statement was not an exercise of his Fifth Amendment right to remain silent. See *San Martin v. Florida* (Fla.1997), 705 So.2d 1337, 1346 (an accused's refusal to give a recorded statement after voluntarily providing an unrecorded statement is not an exercise of his or her right to remain silent). Hence, this argument lacks merit.

{¶ 131} Seventh, Davis argues that the prosecutor improperly commented on his right to remain silent by asking Vanoy whether Davis provided information about Sheeler and his brother, Randy Davis. During cross-examination, trial counsel asked Vanoy whether he had questioned Davis about any potential relationship between Randy and Sheeler. On redirect, the prosecutor asked Vanoy whether Davis had made any connection between Sheeler and Randy during the two interviews. This questioning clarified Vanoy's testimony and did not constitute a comment on Davis's right to remain silent.

{¶ 132} Finally, we reject Davis's argument that his counsel were ineffective by failing to object to Vanoy's testimony. Arguably, counsel were deficient by failing to object to Vanoy's improper testimony that Davis "was being very

deceptive" to them. However, Davis has failed to establish prejudice in view of the overwhelming evidence of his guilt.

{¶ 133} Based on the foregoing, we reject proposition V.

{¶ 134} *Detective Elliget's testimony.* In proposition of law VI, Davis argues that Elliget improperly testified before the scientific reliability of his expert testimony was established, that Elliget was neither qualified nor tendered as an expert witness, and that the prosecutor committed misconduct in questioning Elliget. However, Davis failed to object to Elliget's testimony and thus waived all but plain error. *State v. Childs,* 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus. Davis also stipulated to Elliget's qualifications. Thus, Davis invited any error that he now complains of regarding Elliget's qualifications. *Hal Artz Lincoln–Mercury, Inc.,* 28 Ohio St.3d 20, 28 OBR 83, 502 N.E.2d 590, paragraph one of the syllabus. Alternatively, Davis argues that his counsel's stipulation and failure to object constituted ineffective assistance.

{¶ 135} **1. Scientific reliability.** In addition to the requirement of relevancy, expert testimony must meet the criteria of Evid.R. 702, which provides that a witness may testify as an expert if:

{¶ 136} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons * * *;

{¶ 137} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

{¶ 138} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information."

{¶ 139} Davis invokes *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469, in arguing that Elliget should not have been permitted to testify about fingerprint, blood-spatter, and bloodstain evidence until the trial court had conducted a hearing on the scientific reliability of such evidence. In *Daubert,* the United States Supreme Court held that under Fed.R.Evid. 702, the trial judge has a special obligation to ensure that scientific testimony is not only relevant but reliable. Id. at 589, 113 S.Ct. 2786, 125 L.Ed.2d 469.

{¶ 140} Without a defense objection, the trial court was not obligated to conduct a hearing on the relevance and reliability of Elliget's testimony about fingerprint evidence. Indeed, "the reliability of fingerprint evidence is well established." *State v. Foust,* 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 93.

{¶ 141} Absent a defense objection, the trial court was also not obligated to conduct a hearing on the relevance and reliability of blood-spatter testimony.

See *State v. Biros* (1997), 78 Ohio St.3d 426, 452, 678 N.E.2d 891 (blood-spatter analysis is a proper subject for expert testimony).

{¶ 142} Finally, in the absence of a defense objection, the trial court did not err by not conducting a hearing on the relevance and reliability of the use of an alternate light source to detect unseen bloodstains. Elliget testified that he had applied Leucomalachite to various surfaces in the apartment and had then used an alternate light source to presumptively indicate the presence of blood.

{¶ 143} We have not previously ruled on the reliability of this presumptive testing. However, other jurisdictions have held that Luminol, another chemical used to detect bloodstains using an alternate light source, is sufficiently reliable for what it purports to do: presumptively indicate the presence of blood. *Dodd v. State*, 2004 OK CR 31, 100 P.3d 1017, ¶ 62; *State v. Canaan* (1998), 265 Kan. 835, 964 P.2d 681, paragraph 11 of the syllabus (use of Luminol universally accepted as a presumptive test for blood); *People v. Cumbee* (2006), 366 Ill. App.3d 476, 493, 303 Ill.Dec. 747, 851 N.E.2d 934 (Luminol testing admissible).

{¶ 144} During his testimony, Elliget described the methodology for using an alternative light source to presumptively detect the bloodstains found in the sink area. The state found it unnecessary to introduce other potential testimony establishing the reliability of using an alternate light source because the defense did not object to its reliability. Acceptance of the reliability of such evidence in other jurisdictions supports the conclusion that the trial court committed no plain error by admitting Elliget's testimony.

{¶ 145} Finally, we reject Davis's ineffectiveness claims. Counsel's failure to object falls within legitimate trial strategy. Fingerprint testimony was helpful to the defense because none of Davis's fingerprints were found in Sheeler's apartment. Counsel could also reasonably conclude that an objection to the reliability of fingerprint, blood-spatter, and presumptive bloodstain testing would be unsuccessful.

{¶ 146} **2. Expert qualifications**. Davis argues that no foundation was established to show that Elliget had the background and training to testify as an expert witness.

{¶ 147} During preliminary questioning, defense counsel interrupted Elliget as he was testifying about his expert qualifications: "I'm more than happy to stipulate to Detective Elliget's qualifications. He and I have spoken on numerous different occasions and we would agree and stipulate that he is an expert in criminology and crime scene investigation, collection of evidence * * * [a]nd preservation." Stipulations made by the defendant, or by defendant's counsel in his presence, during a criminal trial are binding. *State v. Turner*, 105 Ohio St.3d 331, 2005-Ohio-1938, 826 N.E.2d 266, ¶ 41.

{¶ 148} We reject this claim on the basis of invited error and plain error. This claim also lacks merit. Evid.R. 702(B) provides that a witness may qualify as an expert by reason of his or her specialized knowledge, skill, experience, training, or education. Neither special education nor certification is necessary to confer expert status upon a witness. The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function. *State v. Baston* (1999), 85 Ohio St.3d 418, 423, 709 N.E.2d 128.

{¶ 149} In addition to the stipulation, Elliget mentioned some of his qualifications as an expert on fingerprints, blood spatter, and trace evidence. Elliget has been a criminalist with the Newark Police Department since 1994 and was a crime-scene analyst for the Mesa, Arizona Police Department from 1982 to 1992. Elliget is trained in the collection of fingerprints and the processing of fingerprints using different types of chemical and powder compounds, he received training from the FBI in the classification and identification of fingerprints, and he has testified as an expert in other cases about fingerprint evidence. Thus, Elliget's experience and training qualified him to testify as an expert about the processing of fingerprints at Sheeler's apartment. See *State v. Hartman* (2001), 93 Ohio St.3d 274, 285–286, 754 N.E.2d 1150.

{¶ 150} Additionally, Elliget's background and experience qualified him to expertly testify about bloodstains and blood spatter. Elliget received training in bloodstain-pattern analysis at the Northwestern Police Training Academy in Chicago, he has been an instructor in bloodstain patterns, and he has testified in numerous cases on blood spatter and the collection of bloodstains. See *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 362, 662 N.E.2d 311.

{¶ 151} Elliget was also qualified to testify as an expert about trace evidence found inside Sheeler's apartment. Elliget received training about trace evidence through the McCrone Institute of Microscopy, he has been an instructor in the collection of trace evidence, and he has testified about trace evidence in other cases.

{¶ 152} We also reject Davis's claim that his counsel were ineffective by stipulating to Elliget's qualifications. Elliget provided some of his qualifications for the jury's consideration. By stipulating to Elliget's qualifications, trial counsel avoided inviting the prosecutor to ask additional questions about Elliget's background and experience that might have bolstered his qualifications even more in the eyes of the jury. Thus, counsel made a legitimate tactical decision. *State v. Ferguson,* 108 Ohio St.3d 451, 2006-Ohio-1502, 844 N.E.2d 806, ¶ 81.

{¶ 153} **3. Failure to tender as an expert witness**. Davis claims that Elliget should not have testified as an expert because the state never formally tendered Elliget as an expert witness. Elliget was qualified to testify as an expert about

fingerprints, blood spatter, and trace evidence. Given his qualifications, the failure to tender Elliget as an expert was of no consequence and did not result in plain error. See *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 114.

{¶ 154} 4. **Other testimony and remarks.** First, Davis claims that the prosecutor misbehaved by eliciting from Elliget that the fingerprints, blood samples, and other evidence recovered from Sheeler's apartment were available for defense testing.

{¶ 155} During redirect examination, the prosecutor asked Elliget about defense access to forensic evidence in the case:

{¶ 156} "Q: Detective Elliget, * * * the items you collected from * * * Mrs. Sheeler's premises, the hairs, the fingerprints, suspected blood, the things that are confirmed blood. Those are all physically in your possession or here in the courtroom, is that correct?

{¶ 157} "A: Yes.

{¶ 158} "Q: * * * [S]ince the day this case was charged, they've been available for—if the Defense had wanted to do any kind of testing, would you have turned that over to them?

{¶ 159} "A: Absolutely."

{¶ 160} Davis argues that Elliget's testimony implied that his expert opinion was accurate because the defense did not present any expert opinion. However, Davis misconstrues Elliget's testimony. Elliget simply informed the jury that the forensic evidence recovered from the victim's apartment was available for testing by both the prosecution and the defense. Thus, Elliget's testimony does not convey the meaning that Davis ascribes to it.

{¶ 161} Second, Davis argues that Elliget improperly vouched for the credibility of the Columbus Police Department ("Columbus P.D.") crime lab. Elliget testified that he forwarded a swabbing from the kitchen sink area and the dish towel to the lab for DNA analysis. Elliget stated that he has dealt with the Columbus lab for a number of years and sent the samples there first, rather than to the state Bureau of Criminal Identification and Investigation, because the "Columbus P.D., they're a fee for service, where the state is none. * * * The problem * * * is that the state takes forever to get the processing done because they have such a large influx of cases."

{¶ 162} Elliget was not vouching for the credibility of the lab. His testimony was simply background information. He explained that the evidence was sent to the Columbus crime lab to obtain fast test results and avoid further delay in the police investigation. There was no plain error.

{¶ 163} Finally, Davis claims that the prosecutor misbehaved by thanking Elliget in front of the jury. Near the conclusion of Elliget's testimony, the prosecutor stated: "Detective Elliget, I appreciate your time and effort both today and previously. Thank you very much." Davis offers no explanation how these remarks were prejudicial. The prosecutor was simply being courteous to the witness. Hence, no plain error occurred.

{¶ 164} Based on the foregoing, we overrule proposition VI.

{¶ 165} *Admissibility of DNA report.* In proposition of law VII, Davis argues that the trial court erred by failing to admit defense exhibit L, the DNA lab report, into evidence. In the alternative, Davis argues that trial counsel were ineffective by failing to fully object to exclusion of the report.

{¶ 166} Meghan Clement, the Technical Director for Forensic Identity Training at LabCorp, testified that Y-chromosome testing identified Davis's DNA on the bloodstained fitted sheet in Sheeler's bedroom. Clement also testified that autosomal STR testing identified Davis's DNA profile as a contributor to a mixture on two of the bloodstains.

{¶ 167} During cross-examination, trial counsel used defense exhibit L in questioning Clement about the DNA results. Defense exhibit L included two charts showing the results of DNA testing. Trial counsel's questions focused on the chart showing the results of autosomal DNA testing. This chart compared the alleles found at the 13 loci showing that Davis's and Sheeler's DNA matched the DNA found on two of the bloodstains. Trial counsel elicited Clement's explanation for scientific data, footnotes, and other information included on the chart.

{¶ 168} Trial counsel offered defense exhibit L into evidence. Counsel argued that this exhibit was "foundational evidence for [Clement] to get to her conclusions and, therefore, the report should be admissible." The trial court did not admit defense exhibit L.

{¶ 169} Trial counsel used Clement's chart as a demonstrative exhibit during final argument. Trial counsel argued that the comparison of Davis's DNA profile with the DNA profile of the bloodstains suggested that Davis's deceased brother, Randy, might be the source of the DNA attributed to Davis.

{¶ 170} During jury deliberations, the jury sent a note stating: "Can we have the DNA statistics of 4.6, 4.7 of Ms. Clement? It was one of the three charts used in Defense's closing statements." Trial counsel stated that the jury should not be given the chart, because it was not admitted at trial. However, trial counsel asked the trial court to reconsider its ruling and admit defense exhibit L. The trial court refused, stating: "[T]he DNA charts prepared by witnesses such as the ones here * * * they're hearsay, not admissible as business records or

anything else." The trial court informed counsel that he would tell the jurors, "[Y]ou must rely on your collective memories for the testimony."

{¶ 171} Davis argues that defense exhibit L should have been admitted because it was a business record under Evid.R. 803(6) and therefore an exception to the hearsay rule. "To qualify for admission under Rule 803(6), a business record must manifest four essential elements: (i) the record must be one regularly recorded in a regularly conducted activity; (ii) it must have been entered by a person with knowledge of the act, event or condition; (iii) it must have been recorded at or near the time of the transaction; and (iv) a foundation must be laid by the 'custodian' of the record or by some 'other qualified witness.'" Weissenberger, Ohio Evidence Treatise (2007) 600, Section 803.73. Even after these elements are established, however, a business record may be excluded from evidence if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Evid.R. 803(6).

{¶ 172} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." See State v. Sage (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus. Even relevant evidence may be excluded under Evid.R. 403(A) if its "probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶ 173} Trial counsel did not offer defense exhibit L into evidence as a business record and did not lay the necessary foundation for doing so. Defense exhibit L indicates that Clement independently reviewed the DNA results. However, Clement offered no testimony showing that defense exhibit L was "generated by a systematic entry kept in the ordinary course of business." State v. Lane (1995), 108 Ohio App.3d 477, 488, 671 N.E.2d 272.

{¶ 174} Even assuming the trial court erred, any error was harmless. Clement's testimony was compelling and credible evidence from which the jury could conclude that Davis's DNA was found on the bloodstained sheet. Clement's testimony, though based in part on the report, was admissible expert opinion. The information and charts on defense exhibit L were merely cumulative of her testimony. Moreover, the jury saw the chart showing the autosomal DNA results during trial counsel's final argument.

{¶ 175} We also reject Davis's ineffectiveness claim. The defense made no proffer. Thus, it is speculative whether further questioning of Clement would have established the necessary foundation for admitting defense exhibit L as a business record.

{¶ 176} Based on the foregoing, we overrule proposition VII.

{¶ 177} *Instructions.* In proposition of law VIII, Davis argues that he was deprived of a fair trial because of erroneous jury instructions. However, except where noted, trial counsel failed to object and waived all but plain error. *State v. Underwood* (1983), 3 Ohio St.3d 12, 13–14, 3 OBR 360, 444 N.E.2d 1332. Additionally, Davis argues that counsel's failure to object constituted ineffective assistance of counsel.

{¶ 178} First, Davis argues that the trial court erred by failing to give an instruction prohibiting the jury from stacking inferences, i.e., drawing one inference from another. The trial court refused to give this proposed instruction, but did instruct the jury:

{¶ 179} "Circumstantial evidence is the proof of facts or circumstances by direct evidence from which you may reasonably infer other related or connected facts which naturally and logically follow according to the common experience of mankind.

{¶ 180} " * * *

{¶ 181} "To infer or to make an inference is to reach a reasonable conclusion or deduction of fact which you may, but are not required to, make from other facts which you find have been established by direct evidence. Whether an inference is made rests entirely with you."

{¶ 182} In *State v. Palmer* (1997), 80 Ohio St.3d 543, 561, 687 N.E.2d 685, we held that an instruction on stacking inferences was unnecessary when the trial court had given an instruction on inferences similar to the one given in this case. Thus, the trial court did not err by failing to give the requested instruction.

{¶ 183} Second, Davis argues that the following instructions on Count 1 deprived him of a unanimous verdict:

{¶ 184} "While committing or attempting to commit, or while fleeing immediately after committing or attempting to commit means that the death must occur as part of acts leading up to, or occurring during or immediately after the commission of kidnapping, *or* aggravated robbery, *or* aggravated burglary, and that the death was directly associated with the commission * * * of kidnapping, *or* aggravated robbery, *or* aggravated burglary.

{¶ 185} " * * *

{¶ 186} "Before you can find the Defendant guilty of aggravated murder as alleged in Count 1 of the indictment, the State must also prove beyond a reasonable doubt that the Defendant committed or attempted to commit kidnapping, aggravated robbery *or* aggravated burglary." (Emphasis added.)

{¶ 187} Davis argues that the instruction deprived him of his right to a unanimous jury verdict because some of the jurors may have convicted him of aggravated murder based on the underlying offense of kidnapping and others on

the basis of aggravated robbery or aggravated burglary. However, the trial court's instructions did not result in error, plain or otherwise.

{¶ 188} Jurors need not agree on a single means for committing an offense. The United States Supreme Court has stated, " '[D]ifferent jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.' " *Schad v. Arizona* (1991), 501 U.S. 624, 631–632, 111 S.Ct. 2491, 115 L.Ed.2d 555, quoting *McKoy v. North Carolina* (1990), 494 U.S. 433, 449, 110 S.Ct. 1227, 108 L.Ed.2d 369 (Blackmun, J., concurring); see *State v. McKnight,* 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 226–228 (applying *Schad* rationale in rejecting unanimity claims).

{¶ 189} Davis invokes *Apprendi v. New Jersey* (2000), 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435, and *Ring v. Arizona* (2002), 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556, in arguing that the Sixth Amendment requires any finding of fact that makes a defendant eligible for the death penalty to be unanimously made by a jury. In *Apprendi,* the Supreme Court held that the Sixth Amendment does not permit a defendant to be "expose[d] * * * to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." (Emphasis sic.) Id., 530 U.S. at 483, 120 S.Ct. 2348, 147 L.Ed.2d 435. In *Ring,* a capital case, the Supreme Court held that a trial judge may not make findings of fact on an aggravating circumstance necessary to impose the death penalty, as these findings are within the province of the jury. Id., 536 U.S. at 609, 122 S.Ct. 2428, 153 L.Ed.2d 556. Davis's reliance on *Apprendi* and *Ring* is misplaced because the jury's verdict, and not the judge's findings, made Davis eligible for the death penalty. Thus, this argument lacks merit.

{¶ 190} Third, Davis claims that the trial court's instructions erroneously defined reasonable doubt. However, these instructions conformed to R.C. 2901.05(D), whose constitutionality we have repeatedly affirmed. *State v. Hancock,* 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 76; *State v. Stallings* (2000), 89 Ohio St.3d 280, 293–294, 731 N.E.2d 159. No plain error was committed.

{¶ 191} Fourth, Davis contends that the trial court's instructions on "purpose" improperly made Davis responsible for any foreseeable result that flowed from his unlawful acts, relieved the state of its burden of proof on the mens rea element of aggravated murder, and created a mandatory, rebuttable presumption of the mens rea element from the mere use of a deadly weapon. The giving of this instruction was not error. The instruction does not contain the foreseeability language claimed by Davis. Cf. *State v. Burchfield* (1993), 66 Ohio St.3d 261, 263,

611 N.E.2d 819; *State v. Goodwin* (1999), 84 Ohio St.3d 331, 346, 703 N.E.2d 1251. As to his remaining claims attacking the "purpose" instruction, we have previously rejected these claims. See *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, 781 N.E.2d 72, ¶ 71–75; *State v. Loza* (1994), 71 Ohio St.3d 61, 80–81, 641 N.E.2d 1082.

{¶ 192} Finally, we overrule Davis's ineffectiveness claims. The jury was properly instructed on the elements of the offense under Count 1, reasonable doubt, and purpose. Thus, counsel were not deficient by failing to object to these instructions. See *Campbell*, 69 Ohio St.3d at 49, 630 N.E.2d 339.

{¶ 193} For the foregoing reasons, we overrule proposition VIII.

{¶ 194} ***Sufficiency of the evidence.*** In proposition of law IX, Davis challenges the sufficiency of the evidence to support the kidnapping specification, R.C. 2929.04(A)(7), and the underlying kidnapping charge, R.C. 2905.01(A)(4).

{¶ 195} In reviewing a claim of insufficient evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

{¶ 196} Count 3 charged Davis with kidnapping by removing or restraining Sheeler "with purpose to engage in sexual activity." Davis argues that the state introduced insufficient evidence that he had this purpose.

{¶ 197} "R.C. 2905.01(A)(4) requires only that the restraint or removal occur for the purpose of non-consensual sexual activity—*not that sexual activity actually take place.*" (Emphasis added.) *State v. Powell* (1990), 49 Ohio St.3d 255, 262, 552 N.E.2d 191. The state proved Davis's purpose to engage in sexual activity. Sheeler's body was found lying on the bedroom floor with her legs spread. Her panties were torn and cut in the crotch area and rolled up underneath her breasts. Moreover, presumptive testing of an oral swab obtained during the autopsy showed the presence of semen. Thus, this claim lacks merit.

{¶ 198} We further determine that sufficient evidence of movement or restraint was presented to support the kidnapping charge and specification. For a kidnapping conviction to be upheld, "there must be significant restraint or movement, not just that incident to the killing itself." *State v. Cook* (1992), 65 Ohio St.3d 516, 524, 605 N.E.2d 70. See also *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 48–49.

{¶ 199} The evidence suggests that Sheeler allowed Davis to enter her apartment because she knew him, and that at some point, she was moved against her will from the front of the apartment to the bedroom, where she was eventually

killed. Additionally, the way Sheeler's panties were both torn and cut by a sharp instrument and then rolled up underneath her breasts indicates that she was significantly restrained for some period of time as Davis forcibly assaulted her. Finally, the state presented evidence establishing that certain injuries on Sheeler's neck were consistent with a knife being held against her throat under her chin. As the trial court noted in its sentencing opinion, these wounds showed "[e]vidence of restraint."

{¶ 200} The victim's movement from the living room to the bedroom and her subsequent restraint distinguishes this situation from *State v. Adams,* 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 93, in which we found no evidence that the victim was moved to or from the bedroom where she was killed, and also found no evidence of significant restraint.

{¶ 201} Based on the foregoing, we overrule proposition IX.

### Penalty–Phase Issues

{¶ 202} *Merger.* In proposition of law X, Davis contends that the kidnapping specification should have been merged with the aggravated-robbery specification.

{¶ 203} Before the penalty phase, trial counsel requested merger of Specification 1 (escaping detection) and Specification 2 (kidnapping) with Specification 3 (aggravated robbery) and Specification 4 (aggravated burglary). The trial court merged the escaping-detection specification with the three other specifications. The trial court declined to merge the kidnapping offense because the "kidnapping charge contained a separate animus or intent than that of the aggravated robbery or aggravated burglary."

{¶ 204} This court has held that a kidnapping is implicit within every aggravated robbery. *State v. Jenkins* (1984), 15 Ohio St.3d 164, 198, 15 OBR 311, 473 N.E.2d 264, fn. 29. Hence, the kidnapping and aggravated-robbery specifications must merge unless a separate animus exists as to each specification. *State v. Fears* (1999), 86 Ohio St.3d 329, 343–344, 715 N.E.2d 136.

{¶ 205} Davis invokes *State v. Logan* (1979), 60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d 1345, in arguing that there was no separate animus for the kidnapping and aggravated-robbery specifications. *Logan* established guidelines to determine whether kidnapping and another offense are committed with a separate animus to permit separate punishment under R.C. 2941.25(B). Id. at syllabus. The test to determine whether the kidnapping was committed with a separate animus is whether the "restraint or movement of the victim is merely incidental to a separate underlying crime" or whether instead, it has a "significance independent of the other offense." Id.

{¶ 206} Davis was charged with and convicted of kidnapping Sheeler for the purpose of engaging in sexual activity. The facts indicate that Davis had an

animus to sexually assault or rape Sheeler that was separate from his animus to commit aggravated robbery, a theft-related offense. Thus, we reject Davis's argument that *Logan* requires merger of the kidnapping and aggravated-robbery specifications. Accordingly, proposition X lacks merit.

{¶ 207} *Penalty–phase instructions.* In proposition of law XI, Davis argues that errors in the penalty-phase jury instructions violated his rights and require a new penalty hearing. However, except where noted, trial counsel failed to object and waived all but plain error. *State v. Underwood,* 3 Ohio St.3d at 13–14, 3 OBR 360, 444 N.E.2d 1332. Alternatively, Davis argues that his counsel were ineffective by failing to object.

{¶ 208} First, Davis contends that the trial court erred by admitting trial-phase evidence during the penalty phase and then advising the jury that "only that evidence admitted in the trial phase that is relevant to the aggravating circumstances and to any of the mitigating factors is to be considered by you." To the extent that the jury may have interpreted the instructions as allowing them to determine relevancy, the trial court erred. "It is the trial court's responsibility to determine the admissibility of evidence." *State v. Getsy* (1998), 84 Ohio St.3d 180, 201, 702 N.E.2d 866. However, much of the trial-phase evidence was relevant to the aggravating circumstances, the nature and circumstances of the offense, and the mitigating factors. Thus, the trial court's misstatement did not result in plain error. See *State v. McKnight,* 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 261.

{¶ 209} Davis's ineffective-assistance claim also lacks merit. Davis was not prejudiced by his counsel's failure to object, because overwhelming evidence was properly admitted during the penalty phase that supported the jury's sentencing recommendation.

{¶ 210} Second, Davis contends that the trial court's instructions were constitutionally defective by failing to allocate and define the burden of proof as to the mitigating factors. The trial court instructed the jury, "The Defendant does not have any burden of proof." The jury was then instructed:

{¶ 211} "You *must consider all of the mitigating factors* presented to you. Mitigating factors include, but are not limited to, the nature and circumstances of the offense, the history, character and background of the Defendant, and any other factors that weigh in favor of a sentence other than death. This means that you are not limited to the specific mitigating factors that have been described for you. You should consider any other mitigating factors that weigh in favor of a sentence other than death." (Emphasis added.)

{¶ 212} These instructions did not constitute plain error. In fact, they provided the defense with more favorable instructions on mitigating evidence than required. See *State v. Jenkins,* 15 Ohio St.3d at 171, 15 OBR 311, 473

N.E.2d 264 (defendant has the burden of establishing mitigating factors by a preponderance of the evidence). Counsel were also not ineffective by failing to object to these instructions, because the trial court instructed the jury that the "[d]efendant does not have any burden of proof."

{¶ 213} Third, Davis claims that the instructions on reasonable doubt are constitutionally defective. However, this claim has no merit. See *State v. Goff* (1998), 82 Ohio St.3d 123, 132, 694 N.E.2d 916. We also reject Davis's claim that the burden of proof in capital cases must be proof beyond all doubt. *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph eight of the syllabus. Moreover, trial counsel were not ineffective, because "it was reasonable not to object." *State v. Campbell*, 69 Ohio St.3d at 53, 630 N.E.2d 339.

{¶ 214} Fourth, Davis argues that the trial court erred by failing to instruct on residual doubt. We overrule this claim. See *State v. McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112, syllabus. Moreover, trial counsel were not ineffective by failing to request such instructions, because no evidence supported a finding of residual doubt.

{¶ 215} Fifth, Davis contends that the trial court erred in failing to instruct on the true meaning of parole eligibility. The trial court instructed the jury that if the state failed to prove beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors, then the jurors must decide which of the life sentences should be imposed:

{¶ 216} "1) Life imprisonment without the possibility of parole until the Defendant has served *25 full years* in prison;

{¶ 217} "2) Life imprisonment without the possibility of parole until the Defendant has served *30 full years* in prison;

{¶ 218} "3) Life imprisonment without the possibility of parole." (Emphasis added.)

{¶ 219} These instructions adequately conveyed to the jurors when Davis would be eligible for parole if they chose one of the life-sentence options. See *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 102–103; *State v. Carter* (1995), 72 Ohio St.3d 545, 559, 651 N.E.2d 965. Thus, there was no plain error. Davis's ineffectiveness claim also lacks merit because counsel could reasonably conclude that the trial court's instructions adequately explained the actual length of time Davis must serve in prison before becoming parole eligible.

{¶ 220} Finally, Davis argues that the trial court erred by not instructing on mercy. However, the trial court did not commit plain error by failing to give such instructions. *State v. Lorraine*, 66 Ohio St.3d at 417, 613 N.E.2d 212.

Davis's ineffectiveness claims also lacks merit because the defense was not entitled to such an instruction.

{¶ 221} Based on the foregoing, we overrule proposition XI.

### Victim–Impact Evidence and Argument

{¶ 222} In proposition of law XIV, Davis argues that victim-impact evidence and argument were improperly presented during both phases of the trial. However, except where noted, trial counsel failed to object and waived all but plain error. *State v. Childs,* 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus. In addition, Davis argues that his counsel were ineffective by failing to object.

{¶ 223} First, Davis argues that the prosecutor exploited the emotional atmosphere of the case by repeatedly displaying a photograph of Sheeler taken before her death to the jury. The prosecutor showed Sheeler's photograph to the jurors during his opening statement and showed it to several witnesses who identified her.

{¶ 224} Under Evid.R. 403 and 611(A), the admission of photographs is left to the sound discretion of the trial court. *State v. Biros,* 78 Ohio St.3d at 444, 678 N.E.2d 891. The prosecutor showed Sheeler's photograph to the jurors to acquaint them with the victim in the case. *State v. Leonard,* 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 89 (displaying victim's photo on a big-screen television was not plain error). Moreover, the witnesses were properly shown Sheeler's photograph so they could identify her. Nothing in the record demonstrates that the method in presenting this evidence prejudiced Davis by inflaming the jury's passions. Thus, no plain error occurred.

{¶ 225} Second, Davis argues that the prosecution repeatedly mentioned during trial that the victim was 86 years old. During opening statement, the prosecutor mentioned Sheeler's age when showing her photograph to the jury, and when explaining why neighbors were concerned when they had not seen Sheeler for a couple of days. The prosecutor's comments about Sheeler's age related to the facts in the case and were clearly admissible. See *State v. Fautenberry* (1995), 72 Ohio St.3d 435, 440, 650 N.E.2d 878. Thus, there was no plain error.

{¶ 226} During trial-phase closing argument, the prosecutor mentioned Sheeler's age in pointing out that Davis did not become a suspect merely because of public pressure to solve the murder of an 86–year–old woman. The prosecutor also noted Sheeler's age in explaining that Davis needed to use little force in knocking her out. There was no plain error because the prosecutor's comments about the victim's age explained aspects of the state's case. See *State v. Smith*

(1997), 80 Ohio St.3d 89, 107, 684 N.E.2d 668 ("proving the facts of a murder necessarily involves disclosure of details as to the victims and their lives").

{¶ 227} During the penalty-phase closing argument, the prosecutor noted Sheeler's age in arguing that there was nothing mitigating in the nature and circumstances of the offense. This was a valid argument. See *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 179. Over defense objection, the prosecutor also discussed Sheeler's age in arguing that there was no connection between Davis's abusive childhood and his murder of an 86–year–old woman 30 years later. The prosecutor did not need to mention the victim's age in making this argument. However, Davis suffered no prejudice from the mention of Sheeler's age.

{¶ 228} We also reject Davis's ineffectiveness claim because he fails to demonstrate how counsel's failure to object constituted deficient performance or resulted in prejudicial error.

{¶ 229} Based on the foregoing, we hold that proposition XIV lacks merit.

### Prosecutorial Misconduct

{¶ 230} In proposition of law XII, Davis argues that the prosecutor committed misconduct during both phases of the trial. However, except where noted, trial counsel failed to object and waived all but plain error. *State v. Childs*, 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus.

{¶ 231} The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

{¶ 232} **1. Vouching.** Davis argues that the prosecutor improperly vouched for several of the state's witnesses. An attorney may not express a personal belief or opinion as to the credibility of a witness. *State v. Williams* (1997), 79 Ohio St.3d 1, 12, 679 N.E.2d 646. Vouching occurs when the prosecutor implies knowledge of facts outside the record or places his or her personal credibility in issue. See *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 117.

{¶ 233} First, Davis claims that the prosecutor improperly vouched for the credibility of Tarianne Paxson and Susan Fowls. During closing argument, defense counsel questioned the truthfulness of Paxson's and Fowls's testimony. During rebuttal, the prosecutor argued: "These folks are not the type of people that would come in here and identify somebody in this kind of case unless they were absolutely, positively certain."

{¶ 234} Trial counsel objected to this argument as vouching, and the trial court sustained the objection. Without further objection, the prosecutor argued: "Do these people appear to you to be people that would come in here and identify the person as a murderer unless they were certain? You answer that."

{¶ 235} In rephrasing his comments, the prosecutor did not express an opinion about the witnesses' credibility because he asked the jurors to decide for themselves whether these witnesses were being truthful. *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 95. No improper vouching occurred.

{¶ 236} Second, Davis contends that the prosecutor improperly vouched for the credibility of expert testimony. During trial-phase closing argument, defense counsel attacked the DNA evidence: "There are holes. It's not the infallible science that everybody wants you to believe, and by everybody, I mean Detective Vanoy; I mean Detective Elliget; Meghan Clement; Dr. Tejwani; and Mr. Oswalt."

{¶ 237} During rebuttal, the prosecutor argued:

{¶ 238} "And I could spend a lot of time going through trying to explain to you folks the explanations you've got from the DNA experts * * *; And as long as DNA has been around and as many cases these folks have done—that is, * * * Detective Elliget, Dr. Tejwani, Meghan Clement, and their degrees and stuff, they know these things more than we can hope to know, if we hope to know it at all.

{¶ 239} " * * *

{¶ 240} "The likelihood of Randy Davis [the defendant's deceased brother] being a suspect is—or being involved in this on this evidence is zero, unless you believe the combined total experience of two DNA experts of about—if I added correctly, 37 years, don't know what they're talking about."

{¶ 241} No improper vouching occurred because the prosecutor did not express any personal belief about the experts' credibility. Rather, the prosecutor was simply responding to defense attacks by commenting on the experts' collective experience. See *State v. Watson*, 61 Ohio St.3d at 10, 572 N.E.2d 97 (commenting on years of experience of two detectives not improper vouching); *State v. Tolliver*, Franklin App. No. 02AP–811, 2004-Ohio-1603, 2004 WL 625683, ¶ 105–106 (commenting on bloodstain expert's experience not improper vouching). No error, plain or otherwise, occurred.

{¶ 242} Third, Davis claims that during the trial-phase closing argument, the prosecutor improperly vouched for inmate Richard Hummel by stating:

{¶ 243} "I have heard people say that * * * Richard Hummel is what he is, and that is true. He is what he is. He is not somebody that's willingly coming in

to testify * * * against somebody else charged. * * * [T]here's something different in kind between ratting somebody out because they told you about a drug deal or a bar fight or any number of other crimes and killing an old woman in her own home. Is that so hard to believe that the likes of Richard Hummel, regardless of his blemishes, actually does have a sense of decency about him. That he would * * * testify truthfully to facts that he could not possibly have known."

{¶ 244} No vouching occurred. The state was simply arguing that Hummel was likely telling the truth because he was testifying against another inmate about his murder of an elderly woman rather than about some lesser offense. The prosecutor could refer to matters within the realm of the jurors' common knowledge and understanding in arguing that Hummel was credible.

{¶ 245} Finally, Davis contends that the prosecutor vouched for Sharon Wright's testimony when the prosecutor argued:

{¶ 246} "You don't have somebody you feel as a grandfather or grandmother figure to you die every day, at least I don't. So, the death of Mrs. Sheeler would have been memorable to Sharon Wright. This woman who sent her cards, sent her birthday and Christmas cards, didn't happen every day."

{¶ 247} The prosecutor's comment about Wright's close relationship with Sheeler was made in the context of explaining why Wright would remember the date of Sheeler's death. However, the prosecutor neither implied knowledge of facts outside the record nor placed his personal credibility in issue by making such argument. *State v. Keene* (1998), 81 Ohio St.3d 646, 666, 693 N.E.2d 246. No plain error occurred.

{¶ 248} **2. Defense access to lab results.** Davis argues that the prosecutor improperly commented on the absence of a defense DNA expert witness. To the extent that counsel failed to object, Davis argues that his counsel provided ineffective assistance. These claims lack merit.

{¶ 249} During direct examination, Ramen Tejwani testified that she had provided the defense with all the notes and results from the DNA testing.

{¶ 250} During redirect examination, Meghan Clement was asked by the prosecution whether she had provided "documentation regarding [her] laboratory, about [her] processes and [her] specific testing in this case for access to a defense expert." Trial counsel objected and requested a mistrial, which the trial court overruled. Clement then testified that all material related to this case was provided to the defense through the discovery process.

{¶ 251} Testimony that the DNA material and test results were provided to the defense for independent evaluation helped establish the credibility of the state's experts. Moreover, to the extent the testimony highlighted the absence of a

defense expert, no error was committed. The prosecutor may comment upon the failure of the defense to offer evidence in support of its case. *State v. Clemons* (1998), 82 Ohio St.3d 438, 452, 696 N.E.2d 1009; *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 193, 616 N.E.2d 909.

{¶ 252} We also reject Davis's ineffectiveness claim because trial counsel did object to Clement's testimony. Moreover, counsel were not deficient by failing to object to Tejwani's testimony, because her testimony was admissible.

{¶ 253} **3. Victim-witness testimony.** Davis recasts his objections to victim-witness testimony into claims of prosecutorial misconduct. First, Davis claims that the prosecutor misbehaved by repeatedly mentioning that Sheeler was 86 years old, asking lay witnesses to identify her photograph, and displaying her photograph to the jury. As explained in response to proposition XIV, the prosecutor's comments and the presentation of Sheeler's photograph constituted neither plain nor prejudicial error.

{¶ 254} Davis also argues that the prosecutor improperly elicited the following testimony from Sharon Wright: "[A]t Christmas time or our birthdays, [Sheeler] would give us a card. It would have like five dollars, give me one and also give Rolly [Davis] one." Davis also asserts that Wright improperly testified that Sheeler "reminded [her] of everybody's grandma. She was just a [sic] sweet and lovable and kind as she could possibly be * * *." Finally, Davis claims that the prosecutor misbehaved by mentioning during trial-phase closing argument that Sheeler had been a "grandmother figure" to Wright. In the alternative, Davis argues that his counsel were ineffective by failing to object to Wright's testimony and the prosecutor's argument.

{¶ 255} Wright's testimony was relevant in showing that Davis knew Sheeler quite well and that Davis might have taken advantage of Sheeler's kind nature in gaining entry to Sheeler's apartment. The prosecutor's argument that Wright viewed Sheeler as a grandmother was proper because it explained why Wright remembered the date of Sheeler's death. Neither Wright's testimony nor the prosecutor's argument constituted plain error. Davis's ineffectiveness claims also lack merit because Wright's testimony and the prosecutor's argument were proper.

{¶ 256} **4. Commenting on Davis's silence.** Davis claims that the prosecutor improperly commented on his right to remain silent and attempted to shift the burden of proof from the state to the defendant.

{¶ 257} First, Davis asserts that the prosecutor used the indictment to improperly challenge him to defend himself against the charges. During opening statement, the prosecutor stated:

{¶ 258} "[B]efore you can kind of begin that process of understanding of where the case is going * * *, you have to have at least a sense of what it is the Defendant is accused of doing. And just the fact that he's been accused of it, that he's been indicted, is not evidence. It is simply a document that gives the Defendant notice of what he's expected to defend against, what he's accused of. That's all it is."

{¶ 259} The prosecutor's comments mentioned nothing about Davis's right to remain silent, nor did they shift the burden of proof. Moreover, the prosecutor was entitled to read the indictment to the jury during his opening statement. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 127. No plain error occurred.

{¶ 260} Second, Davis asserts that during opening statements, the prosecutor improperly stated that "nobody can vouch for his whereabouts the night of the 10th or the morning of the 11th." This remark was made in summarizing the expected testimony of the state's witnesses. The prosecutor's statement did not imply that the burden of proof should shift to the defense, nor was this a comment on Davis's right to remain silent.

{¶ 261} Davis also claims that during closing arguments, the prosecutor improperly argued, "[W]e have two ex-girlfriends that say I have no idea where he was the night of the 10th or the early morning of the 11th. Haven't got a clue. Nobody—nobody places—gives this guy an alibi, gives this guy any explanation for his whereabouts."

{¶ 262} The prosecutor's argument was made in the context of Wright's and Geer's testimony and of Davis's failure to give Vanoy an explanation of his whereabouts in his taped statement that was provided to the jury.

{¶ 263} During the state's case-in-chief, Sharon Wright testified about her contact with Roland Davis on the dates when the murder occurred:

{¶ 264} "Q [Prosecutor]: Okay. * * * July 11th, did you have any contact with Mr. Davis?

{¶ 265} "A [Wright]: No sir.

{¶ 266} "Q: July 10th, did you have any contact?

{¶ 267} "A: No, sir.

{¶ 268} "Q: Did he stay at your apartment either one of those days?

{¶ 269} "A: No, sir.

{¶ 270} "Q: Did you know where he was?

{¶ 271} "A: No, sir."

{¶ 272} Terri Geer testified during the state's case-in-chief that Davis had shown up at her house on July 11 and had brought her son a set of drums that

Davis had purchased. She was then asked about her contact with Davis before that:

{¶ 273} "Q [Prosecutor]: Using the day the drums showed up at your house as kind of a focal point, if you would, when is the last time you would have had contact with Mr. Davis if you recall?

{¶ 274} "A [Geer]: Maybe a week or more before that.

{¶ 275} "Q: Okay. So, you cannot account for his whereabouts in the early morning hours of the same day the drum set appeared.

{¶ 276} "A: No.

{¶ 277} "Q: You cannot account for his whereabouts the night before or any of the activities of the day before.

{¶ 278} "A: No."

{¶ 279} As recounted above in our discussion of proposition of law II, Davis's taped interview with Vanoy was an important part of defense counsel's strategy in presenting Davis's case to the jury. During closing argument, defense counsel stated that Davis did not have to testify, because "not only do you have a three and a half, roughly, hour recorded statement from him, but you've got a 112 page transcript that writes down * * * the interview."

{¶ 280} During his interview with Vanoy, Davis denied having any contact with Sheeler after February 19, 2000, when he was still working with Yellow Cab. Davis also discussed where he was living in Newark when he purchased the Grand Marquis on July 10, 2000:

{¶ 281} "SV [Stephen Vanoy]: Ok. Who were you living with * * * the day that you bought that car, July 10th, * * * that night, [Sheeler] died.

{¶ 282} "RD [Roland Davis]: Uh huh.

{¶ 283} "SV: Who were you living with when you bought that car?

{¶ 284} "RD: I think me and Terry [sic, Terri Geer] just broke up and I went back into Sharon's house, I'm thinking.

{¶ 285} " * * *

{¶ 286} "SV: Ok, so * * * who were you living with when you bought that car * * *?

{¶ 287} "RD: (Pause) * * * [E]ither my brother or Sharon, one of the two.

{¶ 288} "SV: Ok, Dana?

{¶ 289} "RD: Yea. Yea.

{¶ 290} "SV: Alright, on Maple?

{¶ 291} "RD: Yea."

{¶ 292} The prosecutor's closing argument, when taken in the context of all the above testimony, shows that he was arguing that there was no explanation for Davis's whereabouts at the time of the murder:

{¶ 293} "We have to know—we have to have some indication one way or another where he was that night. Well, we have two answers to that. Two pieces of information that goes to that. On the one hand we have two ex-girlfriends that say I have no idea where he was the night of the 10th or the early morning of the 11th. Haven't got a clue. Nobody—nobody places—gives this guy an alibi, gives this guy any explanation of his whereabouts. We know he's in town on the 10th because he bought a car that day.

{¶ 294} " * * *

{¶ 295} "Nobody places him anyplace else. DNA places him smack dab where the perpetrator was, both in the bedroom and cleaning up in the kitchen later. Dumb luck. No."

{¶ 296} Here, the prosecutor's argument did not impinge on Davis's right to remain silent or imply that the burden of proof should shift to him. Cf. *State v. Collins* (2000), 89 Ohio St.3d 524, 527–528, 733 N.E.2d 1118. Nevertheless, the prosecutor's mention of "alibi" during his argument was inartful.[1] However, the prosecutor's use of that term did not result in plain error, considering the DNA evidence and other testimony establishing Davis's guilt.

{¶ 297} Third, Davis argues that the prosecutor improperly elicited testimony from Vanoy that Davis refused to give a tape-recorded statement after his second interview. Additionally, Davis argues that his counsel's failure to object constituted ineffective assistance. As explained in proposition V, testimony that Davis refused to provide a recorded statement was not a comment on his right to remain silent. There is also no merit in Davis's ineffectiveness claim because counsel's decision not to object reflected "an objective standard of reasonableness" under *Strickland v. Washington,* 466 U.S. at 688, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 298} Finally, Davis asserts that the prosecutor improperly commented on Davis's silence by mentioning Davis's refusal to give a tape-recorded interview and stating that only guilty people lie. During his rebuttal argument, the prosecutor stated:

{¶ 299} "Mr. Sanderson [the defense counsel] talks about the interview at the police department and * * * it wasn't recorded, and it's not because he didn't say anything important, unlike the words Mr. Sanderson was using, Detective Vanoy

---

1. Alibi is defined as "[a] defense based on the physical impossibility of a defendant's guilt by placing the defendant in a location other than the scene of the crime." Black's Law Dictionary (8th Ed.2004) 79.

said he didn't say anything different. * * * Had it been different, I'd have recorded it.

{¶ 300} " * * *

{¶ 301} "It wasn't any different. The only difference was the Defendant finally admits the obvious. I lied to you down in Florida.

{¶ 302} "Now, he didn't just start lying when he's confronted with the possibility that he's going to be accused of a murder. He lies from the jump and only guilty people do that."

{¶ 303} The prosecutor did not improperly comment on Davis's right to remain silent. Rather, the prosecutor was responding to defense claims that investigators did not record Davis's second interview because "[h]e didn't confess. They assumed they had their man." The prosecutor's argument that Davis had lied was based on Vanoy's testimony that Davis "admitted that he had lied to Detective Mummy about knowing Mrs. Sheeler" during his first interview. The prosecutor's argument that "only guilty people" lie was a comment on Davis's consciousness of guilt and not his silence. Thus, no plain error occurred.

{¶ 304} **5. Denigrating defense counsel.** Davis argues that during trial-phase closing arguments, the prosecutor denigrated defense counsel. It is improper to denigrate defense counsel in the jury's presence. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 167.

{¶ 305} During closing argument, trial counsel challenged expert testimony that the odds were in the quadrillions that another person shared the same DNA profile as Davis. Counsel argued that the odds were really one in 6.5 billion because that is how many people live in the world. During rebuttal, the prosecutor stated:

{¶ 306} "And Mr. Sanderson wants to talk about * * * there's only six and a half billion people in the world, why isn't there only six and a half billion DNA strands. * * * [A]ccording to his argument, nobody else could be born tomorrow, because we wouldn't have enough DNA to go around. Maybe some day in a distant future, long after I'm gone, we'll populate other worlds and there will be 97 quadrillion humans, and maybe then * * * we might have a second person in this world that will have the same DNA pattern. Maybe. * * * There's two people that could have done this, * * * Roland Davis and that loose primate we just quite haven't found yet that's running around Newark."

{¶ 307} The prosecutor could properly respond to defense argument attacking DNA statistics. However, the prosecutor's sarcastic remarks about the "loose primate" running around Newark improperly denigrated trial counsel in front of the jury. The state argues that the prosecutor's comment was not objectionable, because Clement testified that there is "some cross-reactivity with higher pri-

mates" in DNA testing. Nevertheless, in the context in which they were stated, the prosecutor's comments disparaged the defense counsel. See *LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 167.

{¶ 308} The prosecutor's comments did not result in plain error. The prosecutor's denigrating comments did not pervade the closing argument, let alone the entire trial. Moreover, there is no reasonable basis to conclude that the result of the trial would have been different absent these improper comments.

{¶ 309} **6. Arguing for justice.** Davis argues that the prosecutor improperly argued for justice for the victim. Davis also argues that his counsel were ineffective by failing to object to such argument.

{¶ 310} Davis claims that during guilt-phase closing arguments, the prosecutor improperly urged: "[L]et's make this case about Elizabeth Sheeler getting justice * * *." Davis also challenges the prosecutor's rebuttal comment, "Elizabeth Sheeler is asking you on this evidence to convict her murderer and so am I." Finally, Davis argues that during his penalty-phase closing argument, the prosecutor improperly argued, "[J]ustice is a two-way street. * * * [H]e has had his side of the highway. Give Elizabeth Sheeler hers."

{¶ 311} "There is nothing inherently erroneous in calling for justice * * *." *State v. Evans*, 63 Ohio St.3d at 240, 586 N.E.2d 1042. The prosecutor's comments were within the creative latitude afforded both parties in closing arguments. *State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 85–86 (argument that victim "never given justice" like the defendant was proper); *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 145 (argument that "in death, [the victim] asks for justice in her absence" considered proper). Thus, there was no plain error.

{¶ 312} Davis's ineffectiveness claims also lack merit because trial counsel had no basis for objecting to the prosecutor's arguments.

{¶ 313} **7. Penalty-phase misconduct.** Davis claims that the prosecutor committed misconduct a number of times during the penalty phase. Furthermore, Davis argues that his counsel's failure to object resulted in ineffective assistance.

{¶ 314} First, Davis argues that during his opening statement, the prosecutor misbehaved by informing the jurors that they would consider only three specifications during the penalty phase even though the jury had found Davis guilty of four specifications. Davis claims that such an explanation should have come from the court rather than the prosecutor. We overrule this claim because at the start of the penalty phase, the trial court instructed the jury that there were three aggravating circumstances to consider.

{¶ 315} Second, Davis argues that the prosecutor's improper cross-examination of mitigating witnesses and his penalty-phase argument improperly suggested that much of his mitigating evidence should not be considered.

{¶ 316} Davis asserts that the prosecutor improperly asked about his failure to pay child support. Dana Davis, the defendant's brother, described Davis's lengthy work record and mentioned that Davis has five children. During cross-examination, the prosecutor asked, "[I]n light of this experience about him having to go out and work, do you know why he got so far behind in child support for two of these kids?" In a follow-up question, the prosecutor asked, "But in 1989, he's behind in child support to in excess of $31,000 for just two kids, correct?" Dana replied in the affirmative.

{¶ 317} The cross-examination about Davis's failure to pay child support in 1989 was irrelevant and tended to portray Davis in a negative light. Nevertheless, such testimony did not constitute outcome-determinative plain error. See *State v. Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, ¶ 95; *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 161, 749 N.E.2d 226 (erroneous admission of defendant's failure to pay child support deemed harmless beyond a reasonable doubt).

{¶ 318} Next, Davis argues that the prosecutor improperly asked Dana about a lawsuit filed against Davis. During direct examination, Dana testified that Davis used to work at Callander Cleaners and that "[h]is boss would always * * * try to get [Dana] to talk [Davis] into coming back." However, Dana said, the defendant had quit working there because his employer did not keep his promises. During cross-examination, Dana was asked about Davis's failure to repay a $4,000 loan from Callander Cleaners. The prosecutor then asked: "[I]sn't it a fact Callander Cleaners had to sue him to get that money * * *?" Dana said, "I heard nothing about that." The prosecutor committed no misconduct in asking these questions because the defense had opened the door to this line of cross-examination.

{¶ 319} Davis also asserts that the prosecutor improperly asked Dana "about buying $1,200 worth of drums for his ex-girlfriend's son as a way to get back" into Geer's favor. This subject had little relevance. However, no plain error occurred because such testimony had been properly presented earlier.

{¶ 320} Further, Davis complains that the prosecutor misbehaved by improperly asking Dolly Sidle, a friend of the Davis family, about the strength of character of Sharon Davis, the defendant's older sister. During direct, Sidle testified that Sharon told her that she had "seen her mother go through beatings and so forth and she was not doing it herself." During cross-examination, the prosecutor asked Sidle, "So, despite [Sharon's] upbringing, she had the strength of character to say it's not going to happen around here, correct?" Sidle said, "Correct."

{¶ 321} The defense opened the door to the prosecutor's questions. Moreover, because Davis sought to mitigate his offenses by relying on his family background, the prosecutor's cross-examination was relevant in showing that Davis's sister, who had the same family background, had overcome their father's abuse.

{¶ 322} Davis also claims that the prosecutor improperly asked Sidle about her husband's success in overcoming a drinking problem. Although such questioning had only marginal relevance, no plain error occurred.

{¶ 323} Davis also argues that the prosecutor misbehaved in cross-examining Susan McGuire, a childhood friend of Davis, about her abusive father. During direct examination, McGuire testified that she had had an abusive stepfather. During cross-examination, the prosecutor asked, "[T]hat didn't cause you to go out and kill anybody, did it?" McGuire said no. The defense opened the door to this questioning, and no plain error resulted.

{¶ 324} Davis also argues that the prosecutor committed misconduct during his penalty-phase argument by asserting that Davis's abusive upbringing was not mitigating. The prosecutor argued, "[T]here is no logical connection between this man's upbringing as—as alleged mitigating factors and the circumstance that he found himself in * * * the year 2000. There is no connection and, therefore, there is no mitigation." But "[p]rosecutors can urge the merits of their cause and legitimately argue that defense mitigation evidence is worthy of little or no weight." *State v. Wilson*, 74 Ohio St.3d at 399, 659 N.E.2d 292. The prosecutor's argument was not improper and did not result in plain error.

{¶ 325} Third, Davis contends that the prosecutor misbehaved by arguing the absence of mitigating factors the defense never raised. Davis argues that the prosecutor improperly argued that the nature and circumstances of the offense were aggravating when the defense never requested the jury to consider them as mitigating. During his penalty-phase argument, the prosecutor asked, "Is there anything mitigating about the nature and circumstance of the offense[?]" The prosecutor then reviewed key facts in the case and stated, "I defy any one of you to come up with anything mitigating in the circumstances and nature of this offense."

{¶ 326} "Although * * * prosecutors cannot argue that the nature and circumstances of the offense of an offense are aggravating circumstances, the facts and circumstances of the offense must be examined to determine whether they are mitigating. R.C. 2929.04(B). Thus, a prosecutor may legitimately refer to the nature and circumstances of the offense, both to refute any suggestion that they are mitigating and to explain why the specified aggravating circumstance[s] outweigh mitigating factors." *State v. Sheppard* (1998), 84 Ohio St.3d 230, 238, 703 N.E.2d 286. Accordingly, the prosecutor's argument was not improper and did not result in plain error.

{¶ 327} Next, Davis argues that prosecutor improperly argued that Davis did not suffer from a mental disorder, because mental illness was never raised as a mitigating factor. During his penalty-phase rebuttal argument, the prosecutor said:

{¶ 328} "There's been no indication that the Defendant is anything other than he was held back in school a couple times, but no medical diagnosis of some huge mental disorder that wasn't of his choosing, some organic this or that."

{¶ 329} Davis opened the door to this argument when his counsel argued that his father's abuse left a scar on Davis's psyche. Moreover, the prosecutor's comments responded to defense argument that Davis's low IQ scores showed that he "didn't have the capabilities, * * * intelligence * * * [or] resources to call upon to make the type of decision which would have gotten him the help that was not provided in these formative years." The prosecutor was entitled to respond to defense claims by pointing out the absence of evidence that Davis suffered from a serious mental disorder. Thus, no plain error occurred.

{¶ 330} Next, Davis argues that the prosecutor improperly argued that the statutory mitigating factor of youth did not apply because the defense did not raise this as a mitigating factor. During the penalty-phase argument, the prosecutor stated:

{¶ 331} "Remember the situation I think I gave all of you in the jury selection process * * * [and I] gave you a scenario of these two identical aggravated robberies. * * * And I asked you * * * if they're identical that there might be reasons to impose the death penalty in one case but not the other. * * * And then we talked about, well, what if this guy was 18 years old when he committed the offense and from the age of 10 all he ever knew was the life of crime.

{¶ 332} "This guy over here was 35 and had all the options in the world. I submit that this Defendant, Roland Davis, is more like this guy over here. Not because he didn't have some abusive childhood, witnessing his mother being assaulted, no, but because for 30 years he's been out of that. * * * For 30 years he's had an opportunity to work, to make something of himself. But in 2000 he nonetheless chose the course of action that you've convicted him of."

{¶ 333} The prosecutor was not arguing that the mitigating factor of youth did not apply. Rather, the prosecutor presented two hypothetical fact situations to rebut mitigation linking Davis's childhood abuse with the murder of Sheeler 30 years later. Prosecutors can be "colorful or creative" in making final arguments. *State v. Brown* (1988), 38 Ohio St.3d 305, 317, 528 N.E.2d 523. No plain error occurred.

{¶ 334} Finally, Davis's ineffective-assistance claims lack merit. As previously explained, none of the alleged instances of penalty-phase prosecutorial miscon-

duct prejudicially affected Davis's substantive rights. Therefore, trial counsel were not ineffective for failing to object to the prosecutor's comments.

{¶ 335} **8. _Brady_ issue.** Davis contends that the prosecutor committed misconduct by failing to disclose impeaching information, in violation of _Brady v. Maryland_ (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215; _United States v. Bagley_ (1985), 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481.

{¶ 336} Over the state's objection, the defense filed a pretrial motion, requesting the disclosure of all information that impeached or tended to impeach any of the state's witnesses. The trial court overruled this motion.

{¶ 337} Davis contends that the prosecutor committed a _Brady_ violation by failing to reveal that inmate Hummel had violated his probation. However, Davis fails to provide any specifics about the probation violation or when it occurred.

{¶ 338} In _Brady,_ 373 U.S. at 87, 83 S.Ct. 1194, 10 L.Ed.2d 215, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Favorable evidence under _Brady_ encompasses both exculpatory and impeachment evidence, and evidence must be both favorable and material before disclosure is required. _Bagley,_ 473 U.S. at 674, 105 S.Ct. 3375, 87 L.Ed.2d 481. Evidence is material within the meaning of _Brady_ only if there exists a " 'reasonable probability' " that the result of the trial would have been different had the evidence been disclosed to the defense. _Kyles v. Whitley_ (1995), 514 U.S. 419, 433–434, 115 S.Ct. 1555, 131 L.Ed.2d 490, quoting _Bagley,_ 473 U.S. at 682, 105 S.Ct. 3375, 87 L.Ed.2d 481. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." _State v. Johnston_ (1988), 39 Ohio St.3d 48, 529 N.E.2d 898, paragraph five of the syllabus.

{¶ 339} Davis has not supported his _Brady_ claim with sufficient evidence. It is highly speculative whether the failure to disclose the alleged probation violation is "material" because Davis has failed to provide any specifics about the violation. Moreover, Davis fails to show a reasonable probability that the result of the proceeding would have been different if the information had been disclosed before trial. Information about a probation violation might have impeached Hummel's credibility. However, impeachment evidence would not have been significant in the outcome of the case because DNA evidence established Davis's guilt.

{¶ 340} Based on the foregoing, proposition XII lacks merit.

### Ineffective Assistance of Counsel

{¶ 341} In proposition of law XIII, Davis argues that his counsel were ineffective on multiple occasions during both phases of the trial.

{¶ 342} **1. Expert and Investigative Assistance.** Davis contends that his counsel were ineffective for failing to request or demonstrate the need for expert or investigative assistance to fully investigate the case and present an effective penalty-phase defense. However, defense counsel did request funds for a private investigator, a mitigation specialist, a DNA expert, and a defense psychologist. The trial court granted each of these requests. Thus, this claim lacks merit.

{¶ 343} **2. Shackles.** Davis asserts that his counsel were ineffective by failing to request a hearing on the necessity of Davis's wearing shackles during the trial. However, nothing in the record indicates that Davis was tried in shackles or that any restraint used was visible to the jury. Thus, this claim lacks merit.

{¶ 344} **3. Stipulating to Admissibility of DNA Evidence.** Davis argues that his counsel were ineffective by stipulating to evidence establishing the admissibility of DNA evidence. Before trial, the prosecution and defense stipulated to the chain of custody, the qualifications of the DNA experts, and the accreditation of the DNA testing labs, and that DNA testing was conducted under generally accepted means within the scientific community. The trial court admitted the stipulation and ten validation studies to support the DNA testing. The trial court then ruled that the DNA evidence was admissible.

{¶ 345} Davis fails to specify any evidence that his counsel should have presented in lieu of the stipulation that would have undermined the chain of custody, the expert's qualifications, or the admissibility of the DNA test results. In *State v. Pierce* (1992), 64 Ohio St.3d 490, 497, 597 N.E.2d 107, we held that "the theory and procedures used in DNA typing are generally accepted within the scientific community." Moreover, "[n]o pretrial evidentiary hearing is necessary to determine the reliability of the DNA evidence." Id. at 501, 597 N.E.2d 107. Thus, trial counsel's use of stipulations was a legitimate tactical decision that does not constitute ineffective assistance of counsel. *State v. Nicholas* (1993), 66 Ohio St.3d 431, 437, 613 N.E.2d 225 ("the failure to challenge the admissibility of [DNA] evidence cannot be considered ineffective assistance of counsel").

{¶ 346} **4. Stipulations.** Davis also complains that his counsel were ineffective by entering into ten joint stipulations. Davis claims that this number of stipulations suggested to the jury that the defense agreed with the state's theory of the case and that the verdict was a foregone conclusion.

{¶ 347} Trial counsel's decision to enter into these stipulations was a "tactical decision" that falls " 'within the wide range of reasonable professional assistance.' " *State v. Green* (1993), 66 Ohio St.3d 141, 148, 609 N.E.2d 1253, quoting *Strickland v. Washington*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. Nothing in the record suggests that any of the stipulated testimony would have been different had the witnesses been called to the stand. Trial counsel's

stipulations allowed the defense to portray an air of candor before the jury. They also prevented a stream of additional prosecution witnesses from testifying in court. This claim lacks merit.

{¶ 348} **5. Failure to investigate and prepare for mitigation.** Davis argues that his counsel were ineffective during the penalty phase by failing to fully investigate, prepare, and present mitigating evidence.

{¶ 349} The presentation of mitigating evidence is a matter of trial strategy. *State v. Keith,* 79 Ohio St.3d at 530, 684 N.E.2d 47. "Moreover, 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *State v. Bryan,* 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 189, quoting *Wiggins v. Smith* (2003), 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471.

{¶ 350} First, Davis argues that his counsel were ineffective by failing to thoroughly investigate his "psychosocial history" and failing to present the testimony of a psychologist during mitigation. The defense hired Dr. Dennis Eshbaugh, a psychologist, several weeks before the penalty phase to assist in preparing mitigation. The record does not show why Dr. Eshbaugh was not called to testify or what testimony he would have provided. Thus, nothing in the record establishes that counsel were deficient by not calling Dr. Eshbaugh or that, if called, he would have provided relevant mitigating evidence. See *State v. Conway,* 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 118.

{¶ 351} Second, Davis contends that his counsel were ineffective by failing to present a mitigation theme or strategy. Trial counsel's strategy was to convince the jury that Davis should receive a life sentence by showing that he was raised in an abusive home, suffered hearing problems while growing up that hindered his development, and had a low intelligence.

{¶ 352} In support of this strategy, trial counsel presented the testimony of Davis's mother, brother, aunt, and two lifelong family friends. The witnesses testified that Davis had an alcoholic father who frequently beat his mother and abused other family members. Davis's mother and brother testified about his ear problems, and his school records showed that he was a poor student with a low IQ. The defense theory, although unsuccessful, was coherent and fit into the testimony. Counsel made a strategic trial decision in presenting the defense mitigation theory and were not ineffective. See *State v. Hand,* 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 233.

{¶ 353} Third, Davis argues that his counsel were deficient by failing to present testimony about the significance of evidence that he was abandoned at a children's home and suffered from hearing problems when he was young.

{¶ 354} "The decision to forgo the presentation of additional mitigating evidence does not itself constitute proof of ineffective assistance of counsel." *State v. Keith*, 79 Ohio St.3d at 536, 684 N.E.2d 47. " 'Attorneys need not pursue every conceivable avenue; they are entitled to be selective.' " *State v. Murphy*, 91 Ohio St.3d at 542, 747 N.E.2d 765, quoting *United States v. Davenport* (C.A.7, 1993), 986 F.2d 1047, 1049.

{¶ 355} Rose Weimer, the defendant's mother, testified that she left home for three months to escape her husband's abuse. Weimer returned home after learning that her husband had placed their children in a children's home. Weimer then "got all of them back." She also testified about Davis's hearing problems, which his father ignored. Thus, the jury heard testimony that Davis spent time at a children's home and suffered from hearing problems when he was young. It is highly speculative whether additional noncumulative testimony could have been provided about these matters.

{¶ 356} Finally, Davis asserts that counsel were deficient by failing to stipulate to records without calling a witness to explain their significance to the jury. Counsel presented records during the penalty phase including: (1) Davis's medical records from Children's Hospital, (2) a statement that Davis had not been disciplined while in pretrial confinement, and (3) his education records. Counsel made a legitimate tactical choice in introducing Davis's records without highlighting specific information for the jury's consideration. These records were not voluminous, and the jury could readily review this information during their deliberations. See *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 136.

{¶ 357} **6. Other ineffectiveness claims.** Davis raises other instances of alleged ineffectiveness, but none of these has merit. As discussed in other propositions, counsel were not ineffective during jury selection (proposition I), or by failing to object to the introduction of tapes without playing them in court (propositions II and III), or by stipulating to Elliget's qualifications (proposition VI), or by failing to more zealously object to the exclusion of Clement's report (proposition VII). Counsel were also not ineffective by failing to object to prosecutorial misconduct (proposition XII), to Vanoy's testimony (proposition V), or to the instructions (propositions VIII and XI).

{¶ 358} Based on the foregoing, we overrule proposition XIII.

### Sentencing Opinion

{¶ 359} In proposition of law XVI, Davis asserts that there are numerous flaws in the trial court's sentencing opinion.

{¶ 360} First, Davis argues that the trial court failed to explain *why* the aggravating circumstances outweighed the mitigating factors beyond a reasonable

doubt. This claim lacks merit because the opinion contains extensive discussion of the aggravating circumstances and the mitigating factors. Furthermore, our independent reassessment of the sentence will eliminate any deficiencies in the trial court's sentencing opinion. *State v. Fox* (1994), 69 Ohio St.3d 183, 191, 631 N.E.2d 124.

{¶ 361} Second, Davis argues that the trial court improperly evaluated evidence of his abusive childhood and limited intellectual abilities. However, the "assessment and weight to be given mitigating evidence are matters for the trial court's determination." *State v. Lott* (1990), 51 Ohio St.3d 160, 171, 555 N.E.2d 293. Moreover, the fact that mitigation evidence is admissible "does not automatically mean that it must be given any weight." *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph two of the syllabus. Here, the sentencing opinion fully reviewed testimony about Davis's abusive childhood and evidence about his limited intellectual abilities. The trial court could reasonably assign any or no weight to such evidence. See *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 103. Thus, no error was committed.

{¶ 362} Finally, Davis asserts that the trial court ignored mitigating evidence of Davis's abandonment as a child, bullying by other children because he stuttered, his father's verbal abuse in calling him a "retard," and his low IQ indicating borderline intellectual functioning.

{¶ 363} "While a sentencing court must consider all evidence of mitigation, it need not discuss each factor individually." *State v. Phillips* (1995), 74 Ohio St.3d 72, 102, 656 N.E.2d 643, citing *Parker v. Dugger* (1991), 498 U.S. 308, 314–315, 111 S.Ct. 731, 112 L.Ed.2d 812. The trial court discussed Davis's speech problems, including stuttering, his abandonment at the local children's home, and his limited intellectual ability as shown in his school records. The trial court also stated that it "has considered all the mitigating factors raised at any stage of the trial that are relevant to the issue of whether the defendant should be sentenced to death." Therefore, this claim also lacks merit.

{¶ 364} Based on the foregoing, we overrule proposition XVI.

### Noncapital Sentencing

{¶ 365} In proposition of law XVIII, Davis argues that trial court erred by sentencing him on his noncapital offenses to maximum and consecutive sentences in violation of *Blakely v. Washington* (2004), 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403.

{¶ 366} Davis was sentenced to ten years' confinement for kidnapping (Count 3), ten years' confinement for aggravated robbery (Count 4), and ten years' confinement for aggravated burglary (Count 5). The trial court ordered "each count to run consecutive to the other and concurrent to Count 1."

{¶ 367} The trial court made the following findings for imposing maximum and consecutive sentences:

{¶ 368} "As to Counts 3, 4 and 5, the Court finds the Defendant has committed the worst forms of the offenses and further poses the greatest likelihood of committing future crimes on the basis of the aggravating circumstances set out herein and the Defendant's prior criminal history.

{¶ 369} "Further, the Court finds consecutive prison terms are necessary to protect the public and punish the offender and are not disproportionate to those sentences received by others convicted of similar offenses, nor disproportionate to the sentences imposed on similar facts.

{¶ 370} "The Court further finds that the harm here is so great that a single term does not adequately reflect the seriousness of the Defendant's conduct, and that the Defendant's criminal history, as set forth in the discovery record filed with the Court, shows that consecutive terms are necessary to protect the public.

{¶ 371} "The Court also adopts those facts and circumstances with regard to the consecutive sentences and the maximum sentences that have been presented in this case as aggravating circumstances that are relevant to what it has previously indicated regarding consecutive sentences and the maximum sentences."

{¶ 372} At the conclusion of the sexual-classification hearing, trial counsel stated, "[W]e would place an objection on the record to imposition of consecutive sentences" regarding Counts 3, 4, and 5.

{¶ 373} On June 24, 2004, more than one year before Davis's sentencing, the Supreme Court decided *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403. *Blakely* held that the Sixth Amendment prohibits a judge from imposing a sentence greater than that allowed by a jury verdict or by the defendant's admissions at a plea hearing. Id. at 305–306, 124 S.Ct. 2531, 159 L.Ed.2d 403.

{¶ 374} On February 27, 2006, in *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, we applied *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435, and *Blakely*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403, to Ohio's noncapital sentencing statutes. *Foster* held that portions of R.C. 2929.14(C), which requires judicial findings of fact for maximum prison terms, and R.C. 2929.14(E)(4), which requires judicial findings for consecutive terms, are unconstitutional under *Blakely*. *Foster*, paragraphs one and three of the syllabus. *Foster* also held that these unconstitutional statutory provisions are severable and that judicial findings of fact are no longer required before the imposition of maximum sentences or consecutive prison terms. Id., paragraphs two and four of the syllabus.

{¶ 375} In the present case, the trial court's fact-finding in support of maximum and consecutive sentences violated *Foster* because a jury did not make findings on the seriousness of the offense justifying maximum or consecutive sentences.

{¶ 376} However, we reject Davis's challenge to the imposition of his *maximum* sentences based on our recent decision in *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306. In *Payne*, we held, "[A] lack of an objection in the trial court forfeits the *Blakely* issue for purposes of appeal when the sentencing occurred after the announcement of *Blakely*." [2] Id. at ¶ 31. Thus, Davis's failure to object to the imposition of maximum sentences has forfeited his claim on appeal.

{¶ 377} Davis's challenge to the imposition of his *consecutive* sentences is also overruled. Davis objected to the imposition of consecutive sentences but failed to invoke *Blakely* or mention any constitutional grounds as the basis for his objection. Davis's failure to challenge his consecutive sentences as a constitutional violation provided the trial court with no basis to make a proper ruling. See *State v. Awan* (1986), 22 Ohio St.3d 120, 22 OBR 199, 489 N.E.2d 277, syllabus (the failure to raise the constitutionality of a statute or its application at the trial court level, when the issue is apparent at the time of trial, constitutes a waiver of the issue). Thus, as in *Payne*, we hold that counsel's failure to "timely assert his rights under *Blakely* " has forfeited this issue. *Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 23.

{¶ 378} A forfeited claim will still be considered under plain-error analysis. *Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 24. However, the test for plain error is stringent. A party claiming plain error must show that (1) an error occurred, (2) the error was obvious, and (3) the error affected the outcome of the trial. See *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240; Crim.R. 52(B). Moreover, the burden of demonstrating plain error is on the party asserting it. See, e.g., *State v. Jester* (1987), 32 Ohio St.3d 147, 150, 512 N.E.2d 962.

{¶ 379} No plain error occurred. Nothing in the record suggests that Davis's noncapital sentencing would have been more lenient if he had been sentenced in accordance with *Blakely* and *Foster*. Indeed, "[s]ince *Foster*, trial courts no longer must navigate a series of criteria that dictate the sentence and ignore judicial discretion." *Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306,

---

2. "[F]orfeiture is a failure to preserve an objection, and because [the defendant] failed to timely assert his rights under *Blakely*, his failure to preserve the objection must be treated as a forfeiture." *Payne* at ¶ 23.

at ¶ 25. Accordingly, Davis has failed to establish that he was prejudiced by the judicial fact-finding requirements.

{¶ 380} Based on the foregoing, we overrule proposition XVIII.

## Proportionality

{¶ 381} We summarily reject Davis's challenges in proposition of law XV to the constitutionality of Ohio's death-penalty proportionality review based on our precedents. See *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 23; *State v. Steffen*, 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus.

## Constitutionality

{¶ 382} We summarily reject Davis's various claims in proposition of law XVII challenging the constitutionality of Ohio's death-penalty statutes. *State v. Carter* (2000), 89 Ohio St.3d 593, 607, 734 N.E.2d 345; *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph one of the syllabus.

{¶ 383} We also reject Davis's claim that Ohio's death-penalty statutes violate international law and treaties to which the United States is a party. See *State v. Bey* (1999), 85 Ohio St.3d 487, 502, 709 N.E.2d 484.

## Independent Sentence Evaluation

{¶ 384} Having considered Davis's propositions of law, as required by R.C. 2929.05(A), we now independently review Davis's death sentence for appropriateness and proportionality. The evidence at trial established beyond a reasonable doubt that Davis was properly convicted of the aggravated murder of Elizabeth Sheeler while committing or attempting to commit kidnapping, while committing or attempting to commit aggravated robbery, and while committing or attempting to commit aggravated burglary. R.C. 2929.04(A)(7).

{¶ 385} Against these aggravating circumstances, we now weigh the mitigating factors contained in R.C. 2929.04(B). Davis called five mitigation witnesses. He also introduced his medical records from Children's Hospital, his academic records, and a statement that he had not been disciplined while in pretrial confinement. Davis did not present a sworn or unsworn statement.

{¶ 386} Ruth Cummings, the defendant's aunt, testified that Tom Davis, the defendant's father, never supported his family and that the gas and electricity were shut off at their home because of unpaid bills. Tom did not work much and spent his money on "[b]eer, cigarettes, things of that nature." Tom was very

abusive to his family and would "just explode for no reason." Cummings witnessed Tom shove and hit the defendant's mother.

{¶ 387} Davis has four brothers and one sister. Cummings stated that the defendant's mother was "a good caring mother who took care of all their physical needs and fed them and clothed them and took care of everything." Davis and his siblings spent a lot of time with his grandparents, who lived in Newark. Davis was a "devoted grandson * * * [and] cared about them greatly."

{¶ 388} Dana Davis, one of the defendant's younger brothers, testified that their father was an alcoholic who beat their mother four or five days a week. Once, Tom came home really drunk and kicked through the door. Their mother grabbed a butcher knife in self-defense and ended up stabbing Tom when he came at her. Dana also remembers Tom whipping the defendant "with a belt all the way up the stairs and all the way down the stairs one night." When the beatings took place, Dana and his siblings were young, and there was nothing they could do. They would "just scream and holler and beg [their father] not to do it."

{¶ 389} Davis has been married four times and has five children. Davis has worked for an ice cream company, a dry-cleaning company, a cab company, a flower factory, and an oil rig. He also "ran equipment" for Dana's sea-wall and landscaping business.

{¶ 390} Dolly Sidle, a friend of the Davis family, spent a great deal of time at the defendant's home over the years. Sidle stated that the defendant's father was "mean," and "in today's society, they would have probably locked Thomas up a long time ago." She never saw Tom interacting with his children in a positive way by helping them with homework or tossing a football or baseball with them.

{¶ 391} Susan McGuire, a childhood friend of Davis, lived across the street from the Davis family. McGuire testified that Tom was "nice to [the] neighbor kids, but he was always yelling and carrying on at his family, mostly his wife." Davis would sometimes hand tools to Tom when he was working on cars. Tom would "rant and rave" and call Davis a "[r]etard" and "stupid" if Davis gave him a wrong tool. On one occasion, Davis's sister came to McGuire's home to call the police because Tom had hit their mother. At other times, the Davis children would come to McGuire's home to make phone calls because Tom "was always ripping the phone out of the wall."

{¶ 392} Rose Weimer, the defendant's mother, testified that her marriage to Tom was "pure hell." Tom beat her "[e]very chance he got." At one point, Rose left home for three months because Tom "threatened [her] so much." Rose later found out that Tom had placed the kids in the Children's Home. She later returned to Tom and brought their children home. However, Tom continued to threaten and beat Rose.

{¶ 393} Davis stutters when he gets excited or upset. Other children teased Davis in grade school because he stuttered. Davis also had a hearing problem when he was young. Davis had bad earaches, and Rose noticed an odor coming out of one of his ears. This problem persisted for three or four years, but Tom did not want to spend money on a doctor. Later, Davis was diagnosed with a perforated eardrum and had surgery to correct it. She said that Davis did not care much about school and quit after completing the ninth grade.

{¶ 394} After 23 years of marriage, Rose left her husband and moved to Florida with Davis and two of her other children. Davis was 17 or 18 years old when they moved. He got a job, provided financial support for the family, and took care of the two younger children while Rose was at work. Davis helped his family for a long time in Florida. They would put their money together and buy food and pay the rent. About ten years ago, Davis moved back to the Newark area.

{¶ 395} Davis's medical records verify his history of childhood ear problems. Davis's academic records from the Newark city schools show that he was a poor student who received mostly C's and D's. He dropped out of school in the tenth grade. His test scores show an IQ range between 74 and 84.

{¶ 396} Licking County jail records show that Davis had no disciplinary infractions while he was in pretrial confinement between September 8, 2004, and July 12, 2005.

### Sentence Evaluation

{¶ 397} We find nothing in the nature and circumstances of the offense to be mitigating. On July 10 or July 11, 2000, Davis entered Sheeler's apartment and murdered Sheeler by stabbing her in the neck and chest. Davis stole money from the apartment and fled the scene. These facts establish a horrific crime without any mitigating features.

{¶ 398} Davis's character offers nothing in mitigation. However, his history and background provides some mitigating value. Davis was raised by an abusive father who frequently beat his mother and berated him. Davis did poorly in school and dropped out of high school.

{¶ 399} When he was 18 years old, Davis moved with his mother and two younger brothers to Florida. He provided needed financial support for the family and helped look after his brothers. Testimony shows that Davis has a long work record. He is also the father of five children.

{¶ 400} The statutory mitigating features are generally inapplicable, including R.C. 2929.04(B)(1) (victim inducement); (B)(2) (duress, coercion, or strong provocation); (B)(4) (youth of the offender); and (B)(6) (accomplice only). Davis does

not assert the R.C. 2929.04(B)(5) mitigating factor (lack of significant criminal record), nor is there any evidence that the (B)(5) mitigating factor applies.

{¶ 401} We also conclude that Davis's intellectual deficiencies do not qualify as a mental disease or defect under R.C. 2929.04(B)(3). Davis's academic records show that Davis has an IQ between 74 and 84. However, the evidence at trial did not establish that he was mentally retarded. However, Davis's limited intellectual abilities are entitled to weight under the catchall provision of R.C. 2929.04(B)(7).

{¶ 402} We recognize and give weight to other mitigating factors under R.C. 2929.04(B)(7). Such evidence includes the support that Davis shares with his family, and his long work history. Testimony that Davis was victimized by an abusive father is also entitled to weight as a mitigating "other factor." Nevertheless, there was no evidence of any significant connection between Davis's childhood abuse and his murder of Sheeler. Finally, we give weight to Davis's lack of disciplinary infractions while in pretrial confinement. The evidence does not suggest any other (B)(7) mitigating factors.

{¶ 403} The trial court merged the escaping detection aggravating circumstance with the other three aggravating circumstances before the jury's death verdict.

{¶ 404} We find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. Davis's murder of Sheeler during the course of a burglary, robbery, and kidnapping are grave circumstances. In contrast, Davis's mitigating evidence has little significance.

{¶ 405} Finally, we hold that the death penalty is proportionate to death sentences approved for other robbery-murder and burglary-murder cases. See *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 168; *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 124; and *State v. Stallings*, 89 Ohio St.3d at 301, 731 N.E.2d 159. The death penalty is also proportionate to death sentences approved for other cases involving a kidnapping specification. *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 204; *State v. Hartman*, 93 Ohio St.3d at 306, 754 N.E.2d 1150; and *State v. Ballew* (1996), 76 Ohio St.3d 244, 258, 667 N.E.2d 369.

Judgment affirmed.

LUNDBERG STRATTON, O'DONNELL, and LANZINGER, JJ., concur.

MOYER, C.J., and PFEIFER and CUPP, JJ., concur in part and dissent in part.

---

**PFEIFER, J., concurring in part and dissenting in part.**

{¶ 406} I dissent only from the portion of the majority opinion regarding the sufficiency of the evidence of kidnapping in this case. In proposition of law IX, Davis challenges the sufficiency of the evidence to support the kidnapping specification, R.C. 2929.04(A)(7), and the underlying kidnapping charge, R.C. 2905.01(A)(4).

{¶ 407} I would hold that the state failed to present sufficient evidence of the "significant restraint or movement, not just that incident to the killing itself" required to prove kidnapping. *State v. Cook* (1992), 65 Ohio St.3d 516, 524, 605 N.E.2d 70. First, there is insufficient evidence of movement to support kidnapping. The evidence suggests that Davis gained entry into Sheeler's apartment because she knew him. Sheeler's body was found inside her bedroom. However, there is no evidence that Davis moved Sheeler to her bedroom before killing her.

{¶ 408} Second, there appears to be insufficient evidence of restraint beyond that necessary to kill Sheeler. There is no evidence that Sheeler was tied up before she was killed. Admittedly, the victim's torn panties above her breasts and the presence of semen on the oral swabs suggest that Sheeler was orally raped or sexually assaulted. However, no evidence shows whether Sheeler was orally raped or sexually assaulted before she died.

{¶ 409} Based on the .foregoing, proposition IX has merit. Thus, I would reverse Davis's convictions on the kidnapping charge and the separate kidnapping specification because of insufficient evidence. Reversal of Davis's kidnapping specification does not require that his death sentence be vacated.

MOYER, C.J., and CUPP, J., concur in the foregoing opinion.

---

Robert L. Becker, Licking County Prosecuting Attorney, and Kenneth W. Oswalt, Assistant Prosecuting Attorney, for appellee.

David C. Stebbins and Carol Wright, for appellant.